**CHLOE S. DILLON**
California State Bar No. 273748
**FEDERAL DEFENDERS OF SAN DIEGO, INC.**
225 Broadway, Suite 900
San Diego, California 92101-5030
Telephone: (619) 234-8467
Facsimile: (619) 687-2666
Chloe_Dillon@fd.org

Attorneys for Mr. Zepeda-Rodriguez

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>JOSE LUIS ZEPEDA-RODRIGUEZ,<br><br>Defendant. | CASE NO.:   19MJ24357-LL<br><br>MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTIONS TO DISMISS, SUPPRESS EVIDENCE, AND GRANT LEAVE TO FILE FURTHER MOTIONS |

I.      **Statement of Facts and Procedural History**

According to discovery produced by the government, on November 9, 2019, Border Patrol Agent Joshua Ewers was in the area of the "PCT Monument," east of Tecate, California, when he noted some shoeprints crossing the border road. He followed the shoeprints north into the brush for ten minutes, when he found eight individuals laying on the ground. He stated that all eight individuals were wearing "booties." Agent Ewers purportedly questioned the individuals as to their citizenship, country of birth, and immigration status in Spanish. He arrested all eight individuals and noted that the area where they were found was approximately 250 yards north of the border between Mexico and the United States, and nine and a half miles east of the Tecate, California, Port of Entry.

Mr. Zepeda was transported to the Forrest Gate Processing Center, where he was further questioned as to his citizenship and the circumstances of his presence

1   in the United States in Spanish. The government has charged him with a single
2   count of attempted unlawful entry under 8 U.S.C. § 1325(a)(1), to which he has
3   pled not guilty. These motions follow.

4   **II.    Argument**

5       **A.    This Court should dismiss the charging document because Congress violated the non-delegation doctrine when it enacted 8 U.S.C. § 1325(a)(1).**
6

7       Under 8 U.S.C. § 1325(a)(1), Congress has made it a crime for any "alien"
8   to "enter[] or attempt[] to enter the United States at any time or place other than as
9   designated by immigration officers[.]" Congress, then, made it a crime for a non-
10   citizen to enter, or attempt to enter, the United States during a time or at a place that
11   any immigration officer, including any Border Patrol agent, has not designated for
12   entry. That means whether a defendant's conduct amounts to a crime depends on
13   what an executive-branch official has designated. Congress, then, has delegated to
14   the executive branch the ability to define a criminal provision's scope.

15       This violates the non-delegation doctrine because Congress has delegated to
16   an executive-branch official the ability to determine the scope of a criminal
17   provision without providing the executive branch official with "an intelligible
18   principle" to guide the official's discretion. *See Mistretta v. United States*, 488 U.S.
19   361, 372 (1989) (internal quotation marks omitted). As a result, Congress violated
20   the non-delegation doctrine when it enacted § 1325(a)(1). This Court, then, must
21   dismiss this case.

22       **B.    This Court should dismiss the charging document because Congress violated the Due Process Clause's prohibition on vague laws when it enacted 8 U.S.C. § 1325(a)(1).**
23

24       The government violates the Fifth Amendment's Due Process Clause "by
25   taking way someone's life, liberty, or property" based on a "vague" criminal law.
26   *Johnson v. United States*, 135 S. Ct. 2551, 2556 (2015). "A statute can be
27   impermissibly vague for either of two independent reasons." *Hill v. Colorado*, 530
28   U.S. 703, 732 (2000). First, a statute is impermissibly vague if it "fails to give

ordinary people fair notice of conduct it punishes[.]" *Johnson*, 135 S. Ct. at 2556. Second, a statute is impermissibly vague if it "authorizes or even encourages arbitrary and discriminatory enforcement." *Hill*, 530 U.S. at 732. Here, § 1325(a)(1) flunks these requirements. As explained above, the scheme Congress and executive-branch officials created in § 1325(a)(1) allows an immigration officer to decide what places and times to designate for entry. An immigration officer can decide what to designate for any reason or no reason at all. This Court, then, must dismiss this case.

**C.   This Court should dismiss the charging document because this prosecution violates equal protection and due process.**

The Court should dismiss the information because this prosecution violates equal protection and due process. Misdemeanor illegal entry under 8 U.S.C. § 1325 is the only petty offense that prosecutors in the Southern District of California do not bring through the Central Violations Bureau ("CVB"). CVB defendants are generally cited and released, receive notice of their court date in the mail, and resolve their charges without a criminal conviction. By contrast, § 1325 defendants are arrested, held in custody, never offered an alternative to a conviction, and always serve some jail time—even though § 1325 defendants have a lower failure-to-appear rate than CVB defendants. This disparate treatment violates equal protection on the basis of alienage, national origin, and race.

This Court can also adjudicate this equal protection claim through the lens of selective prosecution or selective enforcement. The requirements for selective prosecution are met because the U.S. Attorney's disparate treatment of CVB and § 1325 defendants has a discriminatory effect and a discriminatory purpose. The Border Patrol's referral of § 1325 defendants for prosecution in 'regular' court, rather than CVB court, also demonstrates a "policy, plan, or a pervasive pattern" that constitutes selective enforcement. *See Thomas v. County of Los Angeles*, 978 F.2d 504, 509 (9th Cir. 1993).

1    Furthermore, this prosecution violates procedural and substantive due
2   process. The three-factor procedural due process test in *Mathews v. Eldridge*, 424
3   U.S. 319 (1976), weighs in favor of dismissal, because the interest in avoiding a
4   loss of liberty and a conviction are substantial, the risk of an erroneous deprivation
5   of these interests is virtually guaranteed, and any costs or administrative burden on
6   the Government are minimal. Finally, substantive due process has been violated
7   because it shocks the conscience to deprive § 1325 defendants of the substantial
8   benefits of CVB court while extending those benefits to other defendants charged
9   with petty offenses who have an even greater risk of flight.

10          **D.    This Court should dismiss the charging document because 8
11                  U.S.C. § 1325 violates the due process clause.**

12          The offense of 8 U.S.C. § 1325 makes it a crime for "any alien" to enter or
13   attempt to enter the United States outside a port of entry. Congress defined the term
14   "alien" as "any person not a citizen or national of the United States." 8 U.S.C. §
15   1101(a)(3). In *Sessions v. Morales-Santana*, 137 S. Ct. 1678, 1686, 1700–01
16   (2017), the Supreme Court held that the statutes transmitting citizenship to children
17   born abroad violate equal protection under the Fifth Amendment's Due Process
18   Clause—they treat children of unwed mothers and unwed fathers differently.
19   Because the citizenship laws create an unconstitutional exception favoring unwed
20   mothers over unwed fathers, and this offense rests on these invalid statutes, the
21   offense is unconstitutional. Thus, this Court must dismiss the charging document.

22          **E.    This Court should dismiss because the charging document fails to
23                  allege all the elements of the charged offense.**

24          A charging document must include the "essential facts constituting the
25   offense charged[.]" FED. R. CRIM. P. 7(c)(1). That is, a charging document "must
26   set forth each element of the crime that it charges." *Almendarez-Torres v. United
27   States*, 523 U.S. 224, 228 (1998). A charging document "that tracks the words of
28   the statute violated is generally sufficient" to allege the elements of an offense.

*United States v. Jackson*, 72 F.3d 1370, 1380 (9th Cir. 1995). But "implied, necessary elements, not present in the statutory language, must be included in an indictment." *Id.* Thus, if a "statute is silent on mens rea," the government must allege the mens rea in the charging document. *United States v. Morrison*, 536 F.2d 286, 288 (9th Cir. 1976). If a charging document fails "to recite an essential element of the charged offense," that is a "fatal flaw requiring dismissal." United States v. Omer, 395 F.3d 1087, 1088 (9th Cir. 2005) (internal quotation marks omitted).

Here, the government charged a violation of the attempt portion of § 1325(a)(1). Its charging document, however, is deficient because it fails to contain the implied mens rea for the attempt portion of § 1325(a)(1). Specifically, it fails to allege that Mr. Zepeda knew he was an "alien" when he attempted to enter the United States. To convict a defendant of attempted illegal entry in violation of § 1325(a)(1), knowledge of alienage is also required under *Rehaif v. United States*, 139 S. Ct. 2191, 2195–97 (2019). It is further required simply because the offense is charged as an attempt crime. *See States v. Quijada*, 588 F.2d 1253, 1255 (9th Cir. 1978); Wechsler, Jones & Korn, The Treatment of Inchoate Crimes in the Model Penal Code of the American Law Institution: Attempt, Solicitation, and Conspiracy, 61 COLUM. L. REV. 571, 579 (1961). Thus, the charging document fails to allege the elements of the charged offense, and this Court must therefore dismiss it.

**F.     Motion to Dismiss the Complaint because the criminal prosecution of asylum seekers violates the Fifth Amendment, the statute, and international treaty obligations.**

The Court should also dismiss this case because the prosecution of Mr. Zepeda—an asylum seeker—violates the due process clause of the Fifth Amendment. All "persons" present in the United States are protected by the due process clause, "whether their presence here is lawful, unlawful, temporary, or permanent." *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001); *see also United States v. Raya-Vaca*, 771 F.3d 1195, 1202 (9th Cir. 2014) ("[O]nce an individual has entered the United States, he is entitled to the protection of the Due Process

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MR. ZEPEDA'S MOTIONS

Clause."). Courts have explicitly recognized a procedural due process right to petition for asylum. *See, e.g.*, *Wang v. U.S. Att'y Gen.*, 395 F. App'x 670, 672–73 (11th Cir. 2010) (stating that aliens are entitled to due process under the Fifth Amendment); *Abdulai v. Ashcroft*, 239 F.3d 542, 549 (3d Cir. 2001) ("Despite the fact that there is no constitutional right to asylum, aliens facing removal are entitled to due process."); *Diaz-Perez v. INS*, 865 F.2d 328, 332 (D.C. Cir. 1989) ("[A]n alien who has unlawfully entered the United States has a Fifth Amendment procedural due process right to petition the government for political asylum."); *Haitian Refugee Ctr. v. Smith*, 676 F.2d 1023, 1038 (5th Cir. Unit B 1982) ("Congress and the executive have created, at a minimum, a constitutionally protected right to petition our government for political asylum.").

In addition, there is a statutory right to apply for asylum. Congress has provided that "[a]ny alien who is physically present in the United States or who arrives in the United States . . . irrespective of such alien's status, may apply for asylum in accordance with this section, or where applicable, section 1225(b) of this title." 8 U.S.C. § 1158(a)(1). Similarly, Section 1225(b) requires referral to asylum officers in certain circumstances:

> If an immigration officer determines that an alien . . . who is arriving in the United States or [who has not been admitted or paroled] is inadmissible . . . and the alien indicates either an intention to apply for asylum under section 1158 of this title or a fear of persecution, the officer ***shall*** refer the alien for an interview by an asylum officer.

8 U.S.C. § 1225(b)(1)(A)(ii) (emphasis added). Courts have recognized that this statutory right to apply for asylum is a protected interest, and the denial of this right is "a sufficient injury-in-fact under Article III even though there is no due process right to asylum." *Garcia v. Sessions*, 873 F.3d 553, 556 (7th Cir. 2017); *see also Rusu v. INS*, 296 F.3d 316, 321 n.8 (4th Cir. 2002) ("[A]n illegal alien possesses an identifiable liberty interest in being accorded all opportunities to be heard upon the questions involving his right to be and remain in the United States before being

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MR. ZEPEDA'S MOTIONS

deported."); *Lara-Munoz v. INS*, 879 F.3d 865 (9th Cir. 1989) (unpublished table decision) (discussing the "statutory right[]" "to petition for political asylum" under 8 U.S.C. § 1158).

The fundamental requirement of due process "is the opportunity to be heard at a meaningful time and in a meaningful manner." *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (internal quotations omitted). Prosecution for unlawful entry into the United States in pursuit of asylum, however, deprives asylum seekers of a meaningful opportunity to apply for asylum. Prosecution can deprive an asylum seeker from a meaningful opportunity to be heard because of something as simple as detention during prosecution preventing the petitioner from being able to attend a hearing and support an asylum petition in person. *See United States v. Nwene*, 20 F. Supp. 2d 716, 718 (D.N.J. 1998) (describing an Immigration Judge's dismissal of asylum petition because the petitioner "was detained and unable to appear at the proceedings"). More fundamentally, prosecutions like this one improperly deter both the person being prosecuted, as well as future asylum applicants, from availing themselves of their rights to seek asylum. Indeed, this appears to be the express goal of the administration's "zero tolerance" policy.

The Government's decision to prosecute Mr. Zepeda also violates rights afforded to asylum seekers under federal law and pursuant to the 1951 United Nations Convention Relating to the Status of Refugees. Although the United States is not a party to the Convention, it acceded to the 1967 Protocol Relating to the Status of Refugees ("Protocol"), Oct. 4, 1967, 19 U.S.T. 6223, which extended the Convention. In relevant part, the Convention states:

> The Contracting States **shall not impose penalties, on account of their illegal entry or presence, on refugees** who, coming directly from a territory where their life or freedom was threatened . . . , enter or are present in their territory without authorization, provided they present themselves without delay to the authorities and show good cause for their illegal entry or presence.

Convention art. 31(1) (emphasis added). Prosecution of refugees entering the

United States who present themselves without delay to the authorities to seek asylum is clearly an improper imposition of a "penalty," and is fundamentally inconsistent with Article 31 of the Convention.

The Convention and Protocol have been incorporated into federal immigration law, and should be enforceable as a matter of federal law. Federal courts across the country have consistently agreed that the Protocol, to which the United States acceded, "bound parties to comply with the substantive provisions of Articles 2 through 34 of the United Nations Convention Relating to the Status of Refugees." *INS v. Stevic*, 467 U.S. 407, 416 (1984); *see also Cazun v. Att'y Gen.*, 856 F.3d 249, 258 n.15 (3d Cir. 2017) ("The United States agreed to comply with the substantive provisions of Articles 2 through 34" of the Convention). And critically, federal law explicitly provides that the immigration laws include "all laws, ***conventions, and treaties*** of the United States relating to the immigration, exclusion, deportation, expulsion, or removal of aliens." 8 U.S.C. § 1101(a)(17) (emphasis added).

Indeed, as this Court has recently noted, "U.S. asylum law arises largely out of international agreements that have been incorporated into immigration law," including the Convention. *L. v. ICE*, 2018 WL 2725736, at *10 (S.D. Cal. June 6, 2018). Various amendments to federal law were "enacted to . . . conform[] existing law to refugee provisions" in the Convention. *Diaz*, 648 F. Supp. at 646; *see also Barapind v. Reno*, 225 F.3d 1100, 1106 (9th Cir. 2000) ("In enacting the Refugee Act, [Pub. L. No. 96-212, 94 Stat. 197 (1980),] Congress sought to bring United States refugee law into conformity with the . . . Protocol."). Federal immigration law incorporates the Protocol, and therefore also the Convention.

Based on the definition of "immigration laws" in Section 1101, any enforcement of those laws should be consistent with the United States' treaty obligations under the Convention. Because Article 31 provides that countries "shall not impose penalties[] on account of their illegal entry or presence" on asylum

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MR. ZEPEDA'S MOTIONS

seekers who present themselves without delay, Protocol art. 31(1), the prosecution of asylum seekers is inconsistent with Article 31 and federal law.  Dismissal of this case is therefore appropriate.

Asylum seekers are entitled to enter the United States. *See* 8 U.S.C. § 1225(b)(1)(A)(i) (ordering removal "unless the alien indicates either an intention to apply for asylum . . . or a fear of persecution"); *Am. Baptist Churches v. Meese*, 712 F. Supp. 756, 768 (N.D. Cal. 1989) ("Under the Refugee Act of 1980, an individual alien who has entered this country unlawfully may avoid deportation by applying for asylum or for the withholding of deportation."). Furthermore, although no federal court appears to have opined on what constitutes presentment "without delay," according to the United Nations Human Rights High Commissioner for Refugees, it "is a matter of fact and degree [and] depends on the circumstances of the case, including the availability of advice." GLOBAL CONSULTATIONS ON INT'L PROTECTION, SUMMARY CONCLUSIONS ON ARTICLE 31 OF THE 1951 CONVENTION—REVISED, para. 10(f) (Nov. 8–9, 2001), *available at* http://www.unhcr.org/419c783f4.pdf.  In the circumstances here, it is clear that Mr. Lin presented himself without delay and sought asylum.

A criminal prosecution, such as a prosecution pursuant to § 1325, is obviously intended to impose penalties on the person being prosecuted. *See, e.g.*, 8 U.S.C. § 1325(a) (defining entry as a misdemeanor and re-entry as a felony); *United States v. Hrneith*, 522 F. App'x 786, 788 (11th Cir. 2013) ("[I]llegal entry into the United States is a voluntary act that is punishable under federal law."). Because penalties are forbidden by the Convention and, through the Protocol and 8 U.S.C. § 1101(a)(17), federal law, prosecution of asylum seekers is inappropriate under a proper reading of the immigration laws, even where the asylum seekers are present in the United States without having made a lawful entry.

In addition to its incorporation into federal law via the United States' accession to the Protocol, the Convention should also be read as a self-executing

treaty. Although the Protocol tracks Article 36 of the Convention by instructing parties to "communicate to the Secretary-General . . . the laws and regulations which they may adopt to ensure the application of the present Protocol," Protocol art. 3, this provision was adopted on the assumption that it would be unnecessary "in the case of those [countries] which used the procedure of automatic application," such as the United States. THE REFUGEE CONVENTION 1951: TRAVAUX PREPARATOIRES ANALYSED WITH A COMMENTARY BY DR. PAUL WEIS 260, *available at* http://www.unhcr.org/en-us/protection/travaux/4ca34be29/refugee-convention-1951-travaux-preparatoires-analysed-commentary-dr-paul.html. Indeed, "[i]t was an accepted principle of international law that once a Convention had been ratified, it immediately came into force in the territory of the Contracting State concerned. . . . The same applied to accession." *Id*. The United States was cited as an example of a country using "the automatic type" of method to implement international conventions. *Id*.

Because the government's prosecution of Mr. Zepeda violates the Fifth Amendment, the statute, and the United States' international treaty obligations, the Court should dismiss the complaint.

### G.    The Court should suppress or exclude any statements purportedly obtained from Mr. Zepeda.

#### 1.    The Court should suppress statements taken from Mr. Zepeda at the Border Patrol station.

*Miranda v. Arizona* requires "effective and express explanation" of an individual's Fifth Amendment rights. 384 U.S. 436, 444-45 (1966); *see also Doody v. Ryan*, 649 F.3d 986, 1003 (9th Cir. 2011). Furthermore, a waiver of such rights can only be made "with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran v. Burbine*, 475 U.S. 412, 421 (1986); *Berghuis v. Thompkins*, 560 U.S. 370, 382–83 (2010).

This Court begins with the presumption that the defendant did not waive and abandon his constitutional rights. *North Carolina v. Butler*, 441 U.S. 369, 373

(1979). As the Supreme Court held in *Miranda* itself, following a proper warning, "[i]f the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel." 384 U.S. at 475. The Supreme Court and the Ninth Circuit have reiterated that courts must indulge every reasonable presumption against a waiver of these fundamental constitutional rights. *United States v. Heldt*, 745 F. 2d 1275, 1277 (9th Cir. 1984) (citations omitted).

In order to overcome the presumption, the government "must introduce sufficient evidence to establish that under the totality of the circumstances, the defendant was aware of the nature of the right being abandoned and the consequences of the decision to abandon it." *United States v. Garibay*, 143 F.3d 534, 536 (9th Cir. 1998) (citing *Heldt*, 745 F.2d at 1277) (emphasis added). This inquiry requires the Court to determine whether the requisite level of comprehension existed before the purported waiver may be upheld. *See Derrick v. Peterson*, 924 F.2d 813, 820-21 (9th Cir. 1990) *overruled on other grounds by United States v. Preston*, 751 F.3d 1008 (9th Cir. 2014) (en banc).

In this case, Mr. Zepeda was arrested exclusively by a Border Patrol agent, and he was taken by Border Patrol Agents to a Border Patrol Station for processing by immigration officials. Mr. Zepeda was also initially processed according to immigration protocol. In the middle of the interview, the Border Patrol Agent issued Mr. Zepeda warnings that should have clarified for him the fact that he was *no longer* in administrative or immigration proceedings, but that he was in *criminal* proceedings, and that anything he said going forward could be used against him in a subsequent *criminal* prosecution. Furthermore, the government was required under *Miranda* to advise Mr. Zepeda that an attorney *will* be appointed to represent him, if he cannot pay for one.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MR. ZEPEDA'S MOTIONS

1   The government is further required to provide full clarification under *United*
2   *States v. San Juan-Cruz*, 314 F.3d 384 (9th Cir. 2002), and to avoid confusing or
3   conflicting advice. In *San Juan-Cruz*, the Ninth Circuit was specifically concerned
4   with confusing and conflicting warnings by immigration officials prior to a criminal
5   prosecution. 314 F.3d at 388. The court ultimately held that, if the immigration
6   authorities provide confusing warnings, and do not clarify explicitly what the
7   accused's rights are under *Miranda*, then the *Miranda* warnings are deficient and
8   any purported waiver is invalid. *Id.*

9       *San Juan-Cruz* dealt with understanding the fundamental difference of
10   receiving appointed counsel in a criminal proceeding, when removal proceedings
11   do not afford the same right. *Id.* In that case, the last warning given by the
12   immigration agent to San Juan-Cruz informed him that he had the right to appointed
13   counsel. *Id.* at 386-87. However, San Juan-Cruz had previously been advised during
14   the administrative warnings that he only had the right to counsel at his own expense.
15   *Id.* On this basis, the Ninth Circuit invalidated the waiver, finding the later warning
16   of appointed counsel was inadequate to clarify. *Id.* at 388. In doing so, the Ninth
17   Circuit applied the presumption against a knowing and intelligent waiver and noted
18   that the government carries a heavy burden to demonstrate compliance. "When a
19   warning, not consistent with *Miranda*, is given prior to, after, or simultaneously
20   with a *Miranda* warning, the risk of confusion is substantial, such that the onus is
21   on the Government to clarify to the arrested party the nature of his or her rights
22   under the Fifth Amendment." *Id.*

23       Here, there were two problems with the *Miranda* advisal given in this case.
24   First, during the purported *Miranda* warnings, the agent in this case informed Mr.
25   Zepeda that his statements could be used against him in court or in an *immigration*
26   *or administrative proceeding*. The agent thus continued to indicate to Mr. Zepeda
27   that his statements would be used for *immigration or administrative* proceedings
28

and not that his statements would be used to prosecute him for a crime. This combined and contradictory set of warnings violates *San Juan-Cruz*, 314 F.3d 384.

Second, the portion of the *Miranda* warning that purported to advise Mr. Zepeda of his right to appointed counsel failed to do so. The last *Miranda* warning, which concerns the right to appointed counsel, provides "that if [a suspect] cannot afford an attorney one *will* be appointed for him prior to any questioning if he so desires." *Miranda*, 384 U.S. at 479 (emphasis added). While the government need not use this exact language, at a minimum, it "must [] make clear that if the arrested party would like to retain an attorney but cannot afford one, [it] is obligated to appoint an attorney for free." *San Juan-Cruz*, 314 F.3d at 388. This obligation was not communicated to Mr. Zepeda. Here, Mr. Zepeda was advised only that an attorney *could* be appointed, indicating that it was a possibility he could receive one, not a certainty. Under Miranda, the appointment of counsel is not just a possibility; it is "the government's absolute obligation." *United States v. Botello-Rosales*, 728 F.3d 865, 867 (9th Cir. 2013).

Because the government cannot show that the *Miranda* warning in this case clearly apprised Mr. Zepeda of his rights in a criminal prosecution, the statements must be suppressed.

    2.    <u>The Court should exclude the field-statement-testimony of Agent Ewers unless the government complies with the evidentiary rules.</u>

        *a.    The government cannot show that Agent Ewers is a mere language conduit for the introduction of the statements under the hearsay rules.*

The out-of-court statements that the government will want to introduce are being offered for the truth of the matter asserted—specifically, that Mr. Zepeda is a citizen of Mexico and not a citizen of the United States. As such, the statements are hearsay. Fed. R. Evid. 802.

The government intends to introduce these statements under a hearsay exception or exclusion, likely Fed. R. Evid. 801(d)(2) (statement of party

opponent). As the proponent of the evidence, the government bears the burden to establish that it falls within that hearsay exclusion ground. Whether the statement falls within that exclusionary ground is a legal issue that the Court determines when deciding whether or not to admit the evidence. Fed. R. Evid. 104(a).

Mr. Zepeda was unable to find any cases in which the government introduced statements made in another language without an interpreter present. In all the cases addressing circumstances close to this issue, there was, at a minimum, a purported interpreter (even if that interpreter was an agent of the government). Thus, Mr. Zepeda can only assume that the government will put forth Agent Ewers as an interpreter.

Ninth Circuit law is that statements made through a purported interpreter constitute hearsay unless the government is able to establish that the interpreter is a mere "language conduit." *United States v. Nazemian*, 948 F.2d 522, 527 (9th Cir. 1991). In order to be a language conduit, an interpreter must have (1) sufficient capacity, and (2) no motive to misrepresent. *Id*. Whether statements made through an interpreter should be considered statements of the original declarant "require[s] an analysis of the facts on a case-by-case basis." *United States v. Garcia*, 16 F.3d 341, 342 (9th Cir. 1994). Courts consider  "the following four factors ...: (1) which party supplied the interpreter, (2) whether the interpreter had any motive to mislead or distort, (3) the interpreter's qualifications and language skill, and (4) whether actions taken subsequent to the conversation were consistent with the statements as translated." *United States v. Romo-Chavez*, 681 F.3d 955, 959 (9th Cir. 2012).

Here, the government cannot establish that Agent Ewers is a mere language conduit, as the factors all weigh against the government. First, the government provided this 'interpreter,' and moreover, Agent Ewers was primarily acting as a law enforcement officer, not as an interpreter, at the time of these statements. Thus, the first factor tips strongly in favor of Mr. Zepeda. *See Romo-Chavez*, 681 F.3d at 959-60. Second, this witness is testifying on behalf of the government, and he does

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MR. ZEPEDA'S MOTIONS

have a motive to support the government's case, even if that is not a specific motive to mislead or distort. He has an interest in construing the statements to support the government's case.

As to the third factor, Agent Ewers is plainly not qualified as an interpreter. *Cf.* Fed. R. Evid. 604 ("An interpreter must be qualified and must give an oath or affirmation to make a true translation.") And taking a class in Spanish at the Border Patrol academy a number of years ago—a course whose purpose is to train individuals to serve as law enforcement officers, not to speak Spanish or serve as interpreters—does not qualify him as such. If Agent Ewers is qualified to serve as a Spanish interpreter, then any individual who took some high school or college Spanish class is qualified. The fact that Agent Ewers uses Spanish in his job daily is irrelevant. First, Agent Ewers is not learning Spanish from the people he arrests. Second, his job as a Border Patrol Agent is not a language immersion environment; Agent Ewers primarily speaks English when he is on the job. *Cf. Romo-Chavez*, 681 F.3d at 960 (officer grew up in El Paso speaking Spanish, studied it in school, spoke it at home with his wife, and conducted interviews in it on a regular basis).

As to the fourth factor, the actions taken subsequent to the conversation were that Mr. Zepeda was arrested by Agent Ewers, reflecting his understanding of the conversation. Mr. Zepeda took no action in reliance on the conversation. This factor thus does not indicate that both parties took action in reliance on the conversation and does not tip in the government's favor. *Cf. Nazemian*, 948 F.2d at 528; *Garcia*, 16 F.3d at 344.

Evaluating all the factors, Agent Ewers is not properly considered a mere "language conduit," and as such, the government cannot establish that the statements are Mr. Zepeda's through Agent Ewers's interpretation. As such, they are properly excluded because the government has not met its burden as the proponent of the evidence.

### b. Agent Ewers is not qualified to testify as an expert.

Agent Ewers will not be testifying merely to statements he spoke, heard, and perceived. He will instead be employing specialized knowledge in his testimony, in that, he will be translating those statements into English. As such, Agent Ewers's testimony is more properly considered expert testimony and not lay witness testimony, and the government must qualify Agent Ewers as an expert.

Lay witness testimony may incorporate an opinion, but that opinion may not be based on specialized knowledge. Fed. R. Evid. 701. The Rules specifically state that an opinion based on specialized knowledge is expert opinion, and thus Agent Ewers must meet the definition of an expert under Fed. R. Evid. 702:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Here, the Court, as the trier of fact, will be using Agent Ewers's specialized knowledge to understand the evidence: specifically, to understand Mr. Zepeda's statement. It will use that specialized knowledge to determine a fact in issue: whether Mr. Zepeda is a citizen of another country and not a citizen of the United States. And finally, the government is putting forth Agent Ewers as someone who has expertise, by virtue of his knowledge, experience, training, and education. As such, the government should have to qualify Agent Ewers as an expert under the Federal Rules of Evidence, in order to ensure that Agent Ewers has sufficient knowledge of Spanish and that he has reliably applied that knowledge in this case.

Without qualifying Agent Ewers as an expert, any testimony as to any conversation in Spanish with Mr. Zepeda should be excluded.

### 3.    The Court should suppress the field statements as involuntary.

In accordance with Mr. Zepeda's constitutional rights, and under 18 U.S.C. § 3501(b), the Court must also determine whether any statements were made voluntarily. The statute provides a list of factors to be considered in determining voluntariness. 18 U.S.C. § 3501(b). And the Court considers the "totality of the circumstances." *United States v. Preston*, 751 F.3d 1008, 1016 (9th Cir. 2014) (en banc). In addition, under *United States v. Gamez*, in the case of a person who the government considers to be a non-native English speaker, there are additional factors to be considered. 301 F.3d 1138, 1144 (9th Cir. 2002). Looking at all the factors, the Court must suppress any field statements as involuntary.

### 4.    The Court should hold an evidentiary hearing.

This Court must make a factual determination as to whether any statement was voluntarily given prior to its admission into evidence. 18 U.S.C. § 3501(a). Where a factual determination is required, courts are obligated to make factual findings. Fed. R. Crim. P. 12; *United States v. Prieto-Villa*, 910 F. 2d 601, 606-10 (9th Cir. 1990). An evidentiary hearing is required to complete the picture of what occurred in the field through testimony of the agent involved, and Mr. Zepeda requests such a hearing under § 3501.

### H.    The Court should order all *Brady*, *Giglio*, and *Henthorn* information provided to the defense.

The defense moves for the production of all discovery and for the preservation of all evidence he is entitled to under the Constitution and the Federal Rules of Criminal Procedure. Mr. Zepeda requests the opportunity to view and inspect the "booties" that were allegedly worn by Mr. Zepeda and seized at the time of arrest. Mr. Zepeda also specifically requests that the Assistant United States Attorney ("AUSA") assigned to this case oversee (not personally conduct) a review

of all personnel files of each agent involved, and that the AUSA state on the record that he has done so and complied with his obligations to provide this information. *See Kyles v. Whitley*, 514 U.S. 437, 438 (1995; *United States v. Henthorn*, 931 F.2d 29 (9th Cir. 1991). Mr. Zepeda also specifically requests disclosure and all information in the government's possession that any agent involved in this case was ever a member of the "I'm 10-15" Facebook group or of another social media group publishing white supremacist or bigoted posts. This information is evidence of possible bias and is thus required to be produced under Rule 16, *Henthorn*, and *Brady*.

## I.   The Court should grant leave to file further motions as necessary in response to newly-received discovery.

Should Mr. Zepeda receive discovery after today's date that requires him to submit further motions, he requests leave to do so.

Respectfully submitted,

Dated: January 7, 2020                         *s/ Chloe S. Dillon*
                                                Federal Defenders of San Diego, Inc.
                                                Attorneys for Mr. Zepeda-Rodriguez