**CHANDRA L. PETERSON**
California State Bar No. 306935
**FEDERAL DEFENDERS OF SAN DIEGO, INC.**
225 Broadway, Suite 900
San Diego, California 92101-5030
Telephone: (619) 234-8467
Facsimile: (619) 687-2666
Chandra_Peterson@fd.org

Attorneys for Mr. Zepeda-Rodriguez

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO.:   19-mj-24357-LL |
| Plaintiff, | |
| v. | MR. ZEPEDA'S MOTIONS TO:<br>1) DISMISS THE COMPLAINT;<br>2) PROHIBIT HIS UNLAWFUL AND UNCONSTITUTIONAL CIVIL ARREST AT COURT; AND<br>3) STAY PROCEEDINGS IF THIS MOTION IS DENIED TO PERMIT MR. ZEPEDA TO SEEK INERLOCUTORY REVIEW OF THE DENIAL |
| JOSE LUIS ZEPEDA-RODRIGUEZ, | |
| Defendant. | |

//
//
//
//
//
//
//
//
//
//

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# Table of Contents

I.  INTRODUCTION ........................................................................................... 3

II.  MOTION TO DISMISS THE COMPLAINT ................................................ 3

    A.  Relevant History surrounding the Enactment of § 1325 ................. 3

    B.  Legal Framework ............................................................................. 5

    C.  Congress enacted the illegal entry law with a discriminatory purpose. ............................................................................................ 6

        1.  Under the *Arlington Heights* factors, racism and eugenics were a "motivating factor" in the passage of illegal entry laws. ...................................................................................... 7

        2.  New Supreme Court precedent confirms that discriminatory purpose is relevant to a law's constitutionality. ............................................................. 19

    D.  Section 1325 continues to disparately impact Mexican and other Latinx defendants. ........................................................................ 20

    E.  The burden of proof shifts to the government. .............................. 26

III.  MOTION TO PROHIBIT MR. ZEPEDA'S UNLAWFUL AND UNCONSTITUTIONAL CIVIL ARREST AT COURT ......................... 27

    A.  Civil deportation arrests at courthouses violate a longstanding common law privilege protecting people from civil process coming to, attending, and departing from court for official court business ......................................................................................... 29

        1.  Deportation arrests are civil arrests – they are not criminal. ........................................................................... 30

        2.  There is a common law privilege that bars civil arrests at courthouses. ...................................................................... 30

        3.  Because deportation arrests are civil procedures, the common law doctrine barring civil arrests at courthouses necessarily bars deportation arrests at courthouses. ............. 31

    B.  The specter and likelihood of Mr. Zepeda being subject to a civil deportation arrest while attending court for his criminal matter infringes on his Sixth Amendment and Due Process rights to present a defense. ......................................................................... 33

        1.  ICE's courthouse arrest directive creates a chilling effect that harms a defendant's ability to receive due process. ....... 34

        2.  Civil deportation arrests interfere with a defendant's ability to present evidence from defense witnesses ............... 34

    C.  Civil deportation arrests violate the Fourth Amendment. .............. 36

V.  CONCLUSION ........................................................................................... 40

# I.     INTRODUCTION

Because the facts and historical evidence presented here show that the original illegal entry law was enacted with a discriminatory purpose and still has a disparate impact, § 1325 is presumptively unconstitutional under *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977). The burden thus shifts to the government to show that Congress would have passed the 1929 law in the absence of any discriminatory purpose. If the government cannot make this showing, the law is invalid, and the Court must dismiss Mr. Zepeda's criminal charge.

At a minimum, if the Court believes Mr. Zepeda has not shown a discriminatory purpose and a disparate impact, it should schedule an evidentiary hearing. At this hearing, Mr. Zepeda will present expert testimony as further evidence of the law's discriminatory origins. The Court should also schedule an evidentiary hearing if the government submits evidence the Court believes may be sufficient to rebut Mr. Zepeda's evidence. But if the government does not attempt to rebut his evidence, or cannot do so, the law is unconstitutional, and the Court must dismiss the complaint.

Finally, this Court should prohibit the arrest of Mr. Zepeda at the courthouse as civil deportation arrests at courthouses violates long-standing common law principles, as well as Mr. Zepeda's Sixth Amendment and Due Process rights. If this Court fails to grant Mr. Zepeda's motion, he will be vulnerable to irreparable harm. Mr. Zepeda requests that this Court stay the pending trial or final resolution of the case until this motion is resolved. If the Court is not inclined to grant the request for a stay, he requests that the Court notify counsel as soon as possible because counsel intends to appeal the denial of the stay to the district court.

## II.     MOTION TO DISMISS THE COMPLAINT

### A.     Relevant History surrounding the Enactment of § 1325

In April 2020, the Supreme Court relied on historical evidence of a state

3

legislature's racial motives to strike down a criminal law enacted a century earlier. *See Ramos v. Louisiana*, 140 S. Ct. 1390 (2020). Although the law was later reenacted with no evidence of animus, the Court refused to ignore the "racially discriminatory *reasons* that [the state] adopted [its] peculiar rules in the first place." *Id*. at 1401 (emphasis in original). Even the justices' "shared respect for rational and civil discourse" could not "supply an excuse for leaving an uncomfortable past unexamined." *Id*. at 1401 n.44.

Like the law in *Ramos*, the law criminalizing illegal entry into the United States at 8 U.S.C. § 1325 has an "uncomfortable past" that must be examined. *Id*. Enacted at the height of the eugenics movement, the "Undesirable Aliens Act of 1929" was conceived, drafted, and enacted by white supremacists out of a belief that the "Mexican race"[1] would destroy the racial purity of the United States. Legislators referred to Mexicans as "mongrels" and "peons."[2] They claimed Mexicans were "poisoning the American citizen."[3] They sought to keep the country's blood "white and purely Caucasian."[4] They solicited reports and testimony from a eugenicist who likened immigration policy to the "breed[ing] of thoroughbred horses."[5] Not only did this racism underlie the original version of § 1325, the law has disparately impacted Mexicans and other Latin Americans in the century since.

---

[1] In the early 20th century, "Mexican" was conceptualized as a race rather than a nationality. For instance, the 1930 census listed "Mexican" as a "Color or Race." United States Census Bureau, *History: 1930*, https://www.census.gov/history/www/through_the_decades/index_of_questions/1930_1.html. And "[f]rom at least 1846 until as recently as 2001 courts throughout the United States have utilized the term 'Mexican race' to describe Latinos." Lupe S. Salinas, *Immigration and Language Rights: The Evolution of Private Racist Attitudes into American Public Law and Policy*, 7 Nev. L.J. 895, 913 (2007).

[2] *See infra* at 8, 10, 11, 16.

[3] *See infra* at 14, 21.

[4] *See infra* at 11.

[5] *See infra* at 12-13.

### B.     Legal Framework

The Fifth Amendment of the Constitution provides that no person shall be "deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. This clause contains an implicit guarantee of equal protection in federal laws identical to what the Fourteenth Amendment guarantees in state laws. *See Sessions v. Morales-Santana*, 137 S. Ct. 1678, 1686 n.1 (2017).

A law may violate equal protection in three ways. First, a law may discriminate on its face. *See, e.g., Loving v. Virginia*, 388 U.S. 1 (1967). Second, authorities may apply a facially neutral law in a discriminatory way. *See, e.g., Yick Wo v. Hopkins*, 118 U.S. 356 (1886). Third, a legislature may enact a facially neutral law with a discriminatory purpose, which disparately impacts a disfavored group. *See, e.g., Arlington Heights*, 429 U.S. at 265–68.

Here, Mr. Zepeda challenges § 1325 only under the third rationale, so the legal framework of *Arlington Heights* applies. *Arlington Heights* clarified that the effect of a racially discriminatory law does not alone make it unconstitutional— challengers must also show "[p]roof of racially discriminatory intent or purpose" **at the time of the law's passage**. *Id*. at 265 (emphasis added). Determining whether a purpose was discriminatory requires "a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Id*. at 266. *Arlington Heights* gave a non-exhaustive list of relevant factors to consider in this determination, including:

1)     the impact of the official action and whether it bears more heavily on one race than another;

2)     the historical background of the decision;

3)     the specific sequence of events leading to the challenged action;

4)     the [legislature's] departures from normal procedures or substantive conclusions; and

5)     the relevant legislative or administrative history.

*Arce v. Douglas*, 793 F.3d 968, 977 (9th Cir. 2015) (citing *Arlington Heights*, 429 U.S. at 266–68).

The threshold for satisfying these factors is low. Since legislatures are rarely "motivated solely by a single concern," a challenger need not show that the legislature's actions "rested solely on racially discriminatory purposes." *Arlington Heights*, 429 U.S. at 265–66. Instead, the challenger need only show "proof that a discriminatory purpose has been a **motivating factor** in the decision." *Id*. at 265–66 (emphasis added). *See also Arce*, 793 F.3d at 977 (quoting *Arlington Heights* to hold that a challenger need not prove discrimination was the "sole purpose" of the challenged action—only that it was a "'motivating factor'").

Once the challenger shows that discriminatory purpose was a "motivating factor," the burden shifts to the law's defender to show that "the same decision would have resulted even had the impermissible purpose not been considered." *Arlington Heights*, 429 U.S. at 270 n.21. *See also Hunter v. Underwood*, 471 U.S. 222, 228 (1985). If the government cannot show that the legislature would have enacted the offending law in the "absence of the racially discriminatory motivation," the law violates the Fifth Amendment and must be invalidated. *Id*. at 225.[6]

## C.   Congress enacted the illegal entry law with a discriminatory purpose.

A close examination of the political context underlying the criminalization of illegal entry in 1929 reveals a disturbing truth: that racism and eugenics were not only a "motivating factor" in the legislature's passage of this law. *Arlington Heights*, 429 U.S. at 265. They were the primary factor. And as recent Supreme Court precedent confirms, courts must consider this historical evidence in

---

[6] Courts apply strict scrutiny to laws that are "motivated by a racial purpose or object" under *Arlington Heights. Hunt v. Cromartie*, 526 U.S. 541, 546 (1999) (quotations omitted).

determining the statute's constitutionality.

1.    <u>Under the *Arlington Heights* factors, racism and eugenics were a "motivating factor" in the passage of illegal entry laws.</u>

While not "purporting to be exhaustive," the five *Arlington Heights* factors constitute the "proper inquiry in determining whether racially discriminatory intent existed." *Arlington Heights*, 429 U.S. at 268. Applying these factors shows that discrimination was unquestionably a "motivating factor" in the passage of the Undesirable Aliens Act of 1929.

a.    *"The historical background of the decision."*

The 1920s brought a decade of immigration legislation fueled by the eugenics movement and fears of "non-white" immigration.[7] At the start of the decade, Congress passed the first numerical restriction on immigration in the United States.[8] World War I had produced "a feverish sentiment against presumably disloyal 'hyphenated Americans,'" and "few could resist the combination of nativism, job scarcity, and anti-Bolshevism that fueled the politics of restriction."[9]

During the remainder of the decade, legislators aimed for "'America [to] cease to be the "melting pot."'"[10] Prominent restrictionists "spoke increasingly of 'racial indigestion,'"[11] and "the 'contamination' of Anglo-American society."[12] Although the arrival of southern and eastern Europeans in the early 1900s "fueled the rise of American manufacturing," nativists saw these groups as "'undesirable immigrants'" who were "socially inferior, culturally alien, and politically

---

[7] *See generally* Daniel Okrent, *The Guarded Gate: Bigotry, Eugenics, and the Law That Kept Two Generations of Jews, Italians, and Other European Immigrants Out of America*, 2019.

[8] 42 Stat. 5, Act of May 19, 1921.

[9] Mae Ngai, *Impossible Subjects*, (Princeton University Press, 2004), at 19, 20.

[10] Jia Lynn Yang, *One Mighty and Irresistible Tide: The Epic Struggle Over American Immigration*, 2020, at 3 (quoting Senator David A. Reed).

[11] Ngai, at 23.

[12] Kelly Lytle Hernández, *Migra!: A History of the U.S. Border Patrol*, 2010, at 28.

suspect."[13]

These fears of non-white immigration were bolstered by the growing acceptance of eugenics—a theory that "captured the imagination of many of America's leading intellectuals."[14] The popular magazine *The Saturday Evening Post* ran articles warning that new immigrants were racially inferior, impossible to assimilate, and a threat to stability and democracy.[15] The leader of a major scientific institution contended that neither education nor environment could alter the "'profound and inborn racial differences' that rendered certain people inferior."[16] And states throughout the country were drafting laws "based on this burgeoning race science, including aggressive sterilization programs."[17]

At the center of the eugenics movement was Dr. Harry H. Laughlin, the director of the Eugenics Record Office.[18] Dr. Laughlin was well known for his model sterilization law that many states and countries, including the Third Reich of Nazi Germany, used as a template.[19] During the 1920s, Dr. Laughlin testified before Congress multiple times and produced four reports that discussed topics such as "race crossing," "mate selection," "fecundity," "racial composition," and the "individual quality of future population." Exhibit A, *The Eugenical Aspects of Deportation: Hearings before the Committee on Immigration and Naturalization House of Representative*, 70th Congress, Feb. 21, 1928, 2–3. Relying heavily on these theories, Congress would anchor its immigration legislation in eugenics and

---

[13] Hernández, at 28.

[14] Yang, at 35.

[15] Yang, at 8.

[16] Okrent, at 3.

[17] Okrent, at 38. Those sterilization laws were affirmed in the now infamous decision *Buck v. Bell*, 274 U.S. 200, 207 (1927).

[18] Ngai, at 24.

[19] *Harry Laughlin and Eugenics*, Truman State University. Accessible at https://historyofeugenics.truman.edu/altering-lives/sterilization/model-law/.

MR. ZEPEDA'S MOTIONS TO DISMISS THE COMPLAINT, PROHIBIT HIS UNLAWFUL ARREST AND STAY PROCEEDINGS

racial inferiority for the remainder of the decade.[20]

        b.    *"The specific sequence of events leading to the challenged action."*

In the early 1920s, Congress began to focus its legislation around the exclusion of "undesirable" immigrants—which was often code for non-white. *See Ave. 6E Investments, LLC v. City of Yuma, Ariz.*, 818 F.3d 493, 505–06 (9th Cir. 2016) (holding that "the use of 'code words' may demonstrate discriminatory intent"). The first such law was the National Origins Act of 1924, which established quotas based on the national origins of U.S. citizens as reflected in the 1920 census.

The quotas created by the National Origins Act were skewed to keep the nation's "racial strains" predominantly Anglo-Saxon.[21] The law on its face did not count "nonwhite people residing in the United States" toward the quotas it established. Indeed, its newly-created "Quota Board" interpreted this provision to exclude all Black people; all East and South Asians (including those who had American citizenship by birth); and all citizens in Hawaiʻi, Puerto Rico, and Alaska.[22] Congress and the president accepted these exclusions under pressure to "stand firm against the efforts of 'hyphenates' who would 'play politics with the nation's blood stream.'"[23]

Yet there was a wrinkle in the National Origins Act—it did not set quotas on immigrants from countries in the Western Hemisphere. This was due to the influence of large agricultural businesses that "relied heavily on labor from just over the border."[24] As one representative complained, there was no chance of

---

[20] *See Legislative History of American Immigration Law, 1798-1965* (Philadelphia: University of Pennsylvania Press, 1981) 212-13.

[21] Ngai, at 24.

[22] Ngai, at 26.

[23] Ngai, at 35.

[24] Hutchinson, *Legislative History of American Immigration Law, 1798-1965* (Philadelphia: University of Pennsylvania Press, 1981) 212.

capping the number of Mexican immigrants because too many growers were "interested in the importation of these poor peons." Exhibit B, Cong. Rec. House 3619, Feb. 16, 1929.

Legislators were not happy about this exclusion. During congressional hearings, Representative Martin Madden complained that the bill "leaves open the doors for perhaps the worst element that comes into the United States—the Mexican peon." Exhibit C, Cong. Rec. 5887, Apr. 8, 1924. Representative Patrick O'Sullivan criticized the restrictions on Italian immigrants, stating that "the average Italian is as much superior to the average Mexican as a full-blooded Airedale is to a mongrel." Exh. C, Cong. Rec. 5900. Another congressman asked, "What is the purpose of closing the front door to keep out undesirables from Europe when you permit Mexicans to come in here by the back door by the thousands and thousands?"[25]

Despite passing one of the most sweeping immigration laws in decades, legislators were not satisfied. So less than two years after passing the bill, four men began to press a new type of immigration bill that would approach immigration from a criminal—rather than a civil—angle.

        *c.*     *"The relevant legislative or administrative history."*

After passage of the National Origins Act of 1924, the Department of Labor (which at that time governed the Bureau of Immigration) began implementing Congress's new quota system.[26] Then-Secretary of Labor James Davis was a strong advocate of Dr. Laughlin and his eugenics theories—even using them as the basis for policies he had developed and published under the title "Selective Immigration or None."[27] Davis warned that the "rat type" was coming to the United States, and

---

[25] Hernández, at 28.

[26] Hans P. Vought, *The Bully Pulpit* (Macon: Mercer University Press, 2004) 174.

[27] Vought at 174.

1  that these "rat men" would jeopardize the American gene pool.[28]

2  Secretary Davis was nevertheless torn between his belief in eugenics and his
3  responsibility to maintain a large labor supply for the railroad and agriculture
4  industries.[29] So with help from devout racist (and suspected Ku Klux Klan member)
5  Senator Coleman Blease,[30] Davis developed a compromise—Congress would
6  criminalize border crossing *after the fact*, rather than *prevent* it in the first place.[31]
7  That way, they reasoned, authorities could expel Mexicans through a criminal
8  prosecution after the growing season was over, thereby avoiding resistance from
9  businesses that depended on Mexican labor.[32]

10  Secretary Davis and Senator Blease found two eager collaborators in the
11  House of Representatives, both of whom were on the powerful Immigration and
12  Naturalization Committee. Representative John C. Box from Texas had long
13  characterized the goal of immigration law as "the protection of American racial
14  stock from further degradation or change through mongrelization." Exhibit D,
15  Cong. Rec. 2817, Feb. 9, 1928. In one speech at an immigration conference, Rep.
16  Box had explained that

> [t]he Mexican peon is a mixture of Mediterranean-blooded Spanish
> peasant with low-grade Indians who did not fight to extinction but
> submitted and multipled as serfs. Into that was fused much negro slave
> blood....The prevention of such mongrelization and the degradation
> it causes is one of the purposes of our [immigration] laws.

20  Exh. D, Cong. Rec. 2817–2818. Box believed this importation was "raising a
21  serious race question" because Mexicans were "essentially different from us in

---

[28] Vought at 174–75.

[29] Vought at 216.

[30] For biographical and historical context about Senator Blease, *see* Simon, B. "The appeal of Cole Blease of South Carolina: Race, Class, and Sex in the New South," The Journal of Southern History, Feb., 1996, Vol. 62, No. 1 (Feb., 1996), pp. 57-86. Accessible at: http://www.jstor.com/stable/2211206.

[31] MacDougall, Ian, *Behind the Criminal Immigration Law: Eugenics and White Supremacy*, ProPublica, June 19, 2020.

[32] *Id.*

1    character, in social position." Exh. B, Cong. Rec. 3619.

2          Box was joined by the influential Chairman of the House Immigration and

3    Naturalization Committee, Representative Albert Johnson of Washington.

4    Chairman Johnson—for whom the 1924 "Johnson-Reed" National Origins Act was

5    named—was an "energetic and vehement racist and nativist." He headed the

6    Eugenics Research Association, a group that opposed interracial marriage and

7    supported forced sterilizations.[33] He also proudly described his 1924 law as a

8    "bulwark against 'a stream of alien blood, with all its inherited misconceptions

9    respecting the relationships of the governing power to the governed.'"[34] Within two

10   years of the 1924 Act, Chairman Johnson turned to legislation that would exclude

11   the "Mexican race," explaining that while the argument for immigration restriction

12   had previously been economic, now "'the fundamental reason for it is

13   biological.'"[35]

14         Following the lead of these legislators, other lawmakers soon "turned to

15   narratives of racial threat to justify restriction."[36] In 1928, for instance,

16   Representative Robert A. Green of Florida delivered a radio speech (later entered

17   into the congressional record) that advocated for Western Hemisphere quotas. He

18   asserted that countries south of the United States are "composed of mixture blood

19   of White, Indian, and negro." Exhibit E, Cong. Rec. 2462, Feb. 3, 1928.

20   Immigration from these countries, he believed, created a "very great penalty upon

21   the society which assimilates," and put it at a disadvantage to countries that have

22   "kept their blood white and purely Caucasian." Exh. E, Cong. Rec. 2462.

23         Chairman Johnson soon convened hearings on new immigration legislation.

24   _____

25   [33] Dennis Wepman, *Immigration: From the Founding of Virginia to the Closing of Ellis Island* (New York City, Facts on File, 2002), p. 242–43.

26   [34] Roger Daniels, *Guarding the Golden Door* (NY: Hill and Wang, 2004), p. 55.

27   [35] Okrent at 3.

[36] Gonzalez O'Brien, Benjamin. *Handcuffs and Chain Link* (University of

28   Virginia Press 2018), Chap. 1.

*See* Exhibit F, Hearings Before the Committee on Immigration and Naturalization, 69th Congress, Hearing 69.1.3., Jan. 12, 1926. At the first hearing, Chairman Johnson admitted into the record a letter from a constituent in El Paso who urged the legislators to keep out "the scoff and scum, the mongrel, the bootlegger element, from Mexico." Exh. F at 30. In response to this letter, Commissioner General of Immigration Harry Hull, stated, "I think he is right." Exh. F at 30. Rep. Box added, "I have some letters, Mr. Chairman, just like that." Exh. F at 30.

The following month, the same House committee held a hearing on "The Eugenical Aspects of Deportation," where the principle witness was the well-known eugenicist Dr. Laughlin. Exh. A, at 1. Early in the hearing, Chairman Johnson praised Dr. Laughlin's prior reports to Congress on race crossing, mate selection, and fecundity, describing one as a "priceless" resource that would "bear intimately on immigration policy." Exh. A at 3.

Dr. Laughlin testified about his latest eugenics report, the goal of which was to "protect American blood from alien contamination." Exh. A at 3. When Dr. Laughlin encouraged the committee to conduct future research on the effect of "race crossing within the United States," Chairman Johnson replied that such a study would "be of great use to the committee in its deliberations." Exh. A at 11.

Dr. Laughlin discussed the need for further research into "mate selection," because "whenever two races come in contact there is always race mixture" even though the "upper levels tend to maintain themselves because of the purity of the women of the upper classes." Exh. A at 19. The job of any government, Dr. Laughlin explained, was to "demand fit mating and high fertility from the classes who are better endowed physically, mentally, and morally by heredity." Exh. A at 19. By deporting or excluding the "lower races" from the country, Dr. Laughlin contended, "[i]mmigration control is the greatest instrument which the Federal Government can use in promoting race conservation of the Nation." Exh. A at 19.

In response, Chairman Johnson advocated for Congress's use of the "principle of applied eugenics" to "do everything possible" to reduce crime by "debarring and deporting" more people. Exh. A at 25. Rep. Box agreed, stating, "we will have to control immigration to suit our own needs or we will lose our national character," which would "spell destruction for the future of America." Exh. A at 25.

Dr. Laughlin even compared the drafters of deportation laws to "successful breeders of thoroughbred horses," who would never consider "acquiring a mare or a stallion not of the top level" for their "stud farm." Exh. A at 44. One such successful breeder he knew "weeds out from the lower levels and recruits by purchase"—a process that is "analogous to immigration in man." Exh. A at 44–45. "Man is an animal," Dr. Laughlin explained, "and so far as heredity and future generations are concerned, there is considerable real basis for [this] comparison." Exh. A at 45.

When such racial engineering is not possible, Dr. Laughlin warned, deportation of the "undesirable individual" becomes even more critical; otherwise, "we cannot get rid of his blood no matter how inferior it may be, because we cannot deport his offspring born here." Exh. A at 45. Dr. Laughlin predicted that so long as the nation's borders remained open to immigrants, "there will always be need for deportation, or the 'final selection.'" Exh. A at 44. In response to this testimony, Chairman Johnson agreed that "[i]mmigration looks more and more like a biological problem, and if the work of this committee results in establishing this principle in our immigration policy we will be well repaid for our efforts." Exh. A at 46.

Though Chairman Johnson's initial legislation stalled, the compromise with the agricultural industry brokered by Secretary Davis and Senator Blease soon made a breakthrough. On January 18, 1929, Senator Blease, on behalf of the Senate Committee on Immigration, submitted a report to the full Senate recommending

14

passage of a law "making it a felony with penalty for certain aliens to enter the United States under certain conditions in violation of law." Exhibit G, Report from the Committee on Immigration, 70th Congress, Report No. 1456, at 1. This report was accompanied by a letter from Secretary Davis on behalf of the Department of Labor advocating for passage of the law. Exh. G at 2.

The following week, Senator Blease presented this bill on the Senate floor, where he reported that Chairman Johnson had "asked me to get the measures over to the House [within two days] if I possibly could." Exhibit H, Cong. Rec. 2092, Jan. 23, 1929. The full Senate passed the bill with almost no discussion or debate. Exh. H, Cong. Rec. 2092.

Two weeks later, Chairman Johnson submitted a report from the Committee of Immigration and Naturalization to the full House recommending passage of the illegal entry law. Exhibit I, Deportation of Aliens, 70th Congress, Report. No. 2397, Feb. 6, 1929. The language of the illegal entry law was virtually identical to the current version of § 1325. *See* Exh. I at 3.

During debate on the bill, Rep. Thomas L. Blanton complained that Mexicans "come into Texas by hordes all of the time" and that "my friend Judge Box has been making a just fight against this situation for years." Exh. B, Cong. Rec. 1929. Rep. Blanton urged the House to "apprehend the thousands of these Mexicans who are in Texas now unlawfully and put them back across the Rio Grande and keep them there." Exh. B, Cong. Rec. 1929. Rep. Schafer added that "[t]hese Mexicans also come into Wisconsin in droves," and Rep. Blanton challenged others to visit the international ports of entry in Texas to see the "hordes that come across the bridges with no intention of ever going back." Exh. B, Cong. Rec. 3619. Rep. Fitzgerald then added that from a "moral standpoint," Mexicans were "poisoning the American citizen" because they are "of a class" that is "very undesirable." Exh. B, Cong. Rec. 3620.

Representative Free assured the representatives that a quota system was

15

unnecessary because under existing laws, immigrants could already be excluded if they were idiots, imbeciles, feeble-minded persons, epileptics, psychopaths, alcoholics, beggars, vagrants, laborers, criminals, polygamists, illiterates, or prostitutes. Exh. B, Cong. Rec. 3620. Rep. Free then asserted that "if we simply enforced" these laws, "we could keep out most Mexicans." Exh. B, Cong. Rec. 3620. The legislature applauded. Exh. B Cong. Rec. 3620.

Minutes later, the bill passed, and the president signed it into law days later. Exh. B, Cong. Rec. 3621.

> ### d.    *"The legislature's departures from normal procedures or substantive conclusions."*

Examining this *Arlington Heights* factor—whether a decisionmaker departs from "normal procedures or substantive conclusions"—requires courts to consider any "procedural irregularities" leading up to the enactment of a law that could signal a discriminatory intent. *Pac. Shores Properties, LLC v. City of Newport Beach*, 730 F.3d 1142, 1164 (9th Cir. 2013). Courts may also consider illogical or counter-intuitive conclusions in the decision-making process. *See, e.g., Ave. 6E Investments, LLC v. City of Yuma*, 818 F.3d 493, 507 (9th Cir. 2016) (citing the city's decision to "disregard the zoning advice of its own experts"). Here, not only do the overtly racist statements of legislators during the law's passage show its discriminatory purpose, several irregularities and illogical conclusions in the passage of the 1929 law also implicate this factor.

To begin, the 1920s was the first and only era in which Congress openly relied on the now-discredited theory of eugenics to enact immigration legislation. Both the 1924 and 1929 immigration laws drew heavily on Dr. Laughlin's belief that immigration control was a matter of racial engineering, akin to horse breeding. And while Congress ultimately repealed the eugenics-based National Origins Act

of 1924 based on a "racial egalitarian motivation,"[37]  illegal entry remains one of the only laws still in effect from that era. *See* Immigration and Nationality Act of 1965, Pub. L. 89–236 (abolishing the National Origins Formula).

Second, the law represents one of Congress's first attempts to control immigration through criminal, rather than civil, laws. Prior to 1929, Congress's efforts to regulate immigration generally occurred through national quotas or exclusion. But with the 1929 law, Congress sought to punish immigrants after their entry—not just exclude them. Not only did this avoid concerns from agricultural interests, it reflected the widely held belief that Mexicans were prone to criminality (even though studies at the time showed the opposite) and must be treated as criminals. *Compare* Exh. L at 2 (Rep. Box stating that "[f]ew, if any, other immigrants have brought us so large a proportion of criminals and paupers as have the Mexican peons") with Gonzalez O'Brien, Handcuffs and Chain Link, Chap. 1 (congressional study in 1931 found "no conclusive evidence that Mexican immigrants were any more inclined toward criminality than were native whites"). In other words, Congress' focus on the "illegality" of Mexican immigrants soon "linked this illegality to criminality."[38]

Third, the racial vitriol expressed during the debates was directed almost exclusively at Mexicans—even though Canadians were also entering the United States in record numbers. *See* Exh. B at 8 (stating that 81,506 Canadians entered the United States in 1928). If the 1929 Act were motivated by generalized xenophobia or economic anxiety, rather than racism, one would expect legislators to criticize foreigners across the board. But no legislator referred to Canadians as "mongrels." No legislator complained of "hordes" of Canadians crossing the

---

[37] Gabriel J. Chin, *The Civil Rights Revolution Comes to Immigration Law: A New Look at the Immigration and Nationality Act of 1965*, 75 N.C. L. Rev. 273, 301 (1996)

[38] Gonzalez O'Brien, *Handcuffs and Chain Link*, Chap. 1.

border. No legislator objected that Canadians were "poisoning the American citizen." These irregularities show that not only was Congress's passage of the Undesirable Aliens Act based on eugenics and racism, it also departed from the substantive conclusions underlying most immigration laws.

> e.   *"The impact of the official action and whether it bears more heavily on one race than another."*

Within a year of the 1929 criminalization of illegal entry, the government had prosecuted 7,001 cases; by 1939, that number rose to over 44,000.[39] In each of these years, individuals from Mexico comprised no fewer than 84% of those convicted, and often made up as many as 99% of defendants.[40] And the number of prosecutions has soared in recent years—since 2008, annual prosecutions for § 1325 have typically hovered around 50,000 or 60,000.[41] So even under a conservative estimate, this means that since the law's passage over a million Mexicans have likely been prosecuted for illegal entry—far more than any other nationality.

In sum, applying the five *Arlington Heights* factors shows that racism and eugenics were a "motivating factor" in the passage of the Undesirable Aliens Act. And as new Supreme Court precedent confirms, courts must consider this historical evidence in determining whether a statute is constitutional.

---

[39] *Annual Report of the Attorney General of the United States for the Fiscal Year 1939*, 37; Kelly Lytle Hernández, *City of Inmates: Conquest, Rebellion, and the Rise of Human Caging in Los Angeles, 1771-1965*, n.6 at 138–39 (UNC Press, 2017).

[40] Hernández, *supra* n. 6, at 138-39 (citing U.S. Bureau of Prisons, *Federal Offenders*, Fiscal Years, 1931-36.

[41] "§ 1325 Defendants Charged (Annual)," Executive Office for United States Attorneys, *available at:* https://www.justice.gov/opa/press-release/file/1210896/download.

18

2. <u>New Supreme Court precedent confirms that discriminatory purpose is relevant to a law's constitutionality.</u>

Two recent Supreme Court cases confirm that a discriminatory purpose that fueled a law's original enactment remains relevant in determining its constitutionality. In *Ramos v. Louisiana*, the Court struck down a state law permitting convictions by non-unanimous juries, citing the "racially discriminatory reasons that Louisiana and Oregon adopted their peculiar rules in the first place." 140 S. Ct. at 1401 (emphasis in *Ramos*). Although Justice Alito argued in his dissent that both states later recodified their non-unanimity rules with no mention of race, the majority rejected the notion that this cured the laws' original animus, holding that if courts must "assess the functional benefits" of a law, they cannot "ignore the very functions those rules were adopted to serve." *Id*. at 1401 n.44. Nor could the justices' "shared respect for rational and civil discourse . . . supply an excuse for leaving an uncomfortable past unexamined." *Id*. (citation and quotations omitted).

Two months later, the Supreme Court struck down a Montana law prohibiting families from using state-sponsored scholarships at religious schools. *See Espinoza v. Montana Dep't of Revenue*, __ S. Ct. __, 2020 WL 3518364 (June 30, 2020). The majority relied on the law's "checkered tradition" of underlying religious discrimination, even though it was reenacted in the 1970s "for reasons unrelated to anti-Catholic bigotry." *Id*. at *9.

Concurring, Justice Alito invoked his *Ramos* dissent, noting its argument that courts cannot examine impermissible motives underlying the original version of a law where states have "readopted their rules under different circumstances in later years." *Id*. at *16 (quotations omitted). Justice Alito then stated, "But I lost, and *Ramos* is now precedent." *Id*. Justice Alito then provided an extensive history of the anti-Catholic and anti-immigrant motives underlying Montana's law, concluding that "[u]nder *Ramos*, it emphatically does not matter whether Montana readopted the no-aid provision for benign reasons. The provision's 'uncomfortable

19

past' must still be 'examined.'" *Id.* at \*19 (quoting *Ramos*, 140 S. Ct., at 1396, n.44).

Here, the original illegal entry law codified in the Undesirable Aliens Act of 1929 has been reenacted several times, most notably in the Immigration and Nationality Act of 1952.[42]  But *Ramos* and *Espinoza* both confirm that not only do courts examine the racial motivations of a law at the time of its passage, later reenactments do not cleanse the law of its original taint.

The government may also argue that even if racism and eugenics were a "motivating factor" in § 1325's original passage, the law currently serves other legitimate purposes. But laws enacted with a discriminatory purpose cannot be "cured" merely because they later satisfy a non-discriminatory purpose. *See Hunter*, 471 U.S. at 233 (rejecting Alabama's argument that "events occurring in the succeeding 80 years had legitimated" a racially motivated disenfranchisement provision). Rather, when a court determines that a law's "original enactment was motivated by a desire to discriminate . . . on account of race and the section continues to this day to have that effect," the court must conclude that the law "violates equal protection under *Arlington Heights*." *Id.*

### D.    Section 1325 continues to disparately impact Mexican and other Latinx defendants.

*Arlington Heights* requires challengers to show that a law was enacted with a discriminatory purpose and disparately impacts a particular group. *See* 429 U.S. at 265. Here, not only were racism and eugenics a discriminatory purpose motivating the enactment of the first border crossing laws, such laws continue to disparately impact Mexican and other Latinx defendants—both through the sheer

---

[42] *See* June 27, 1952, c. 477, Title II, ch. 8, § 275, 66 Stat. 229; Pub.L. 99-639, § 2(d), Nov. 10, 1986, 100 Stat. 3542; Pub.L. 101-649, Title I, § 121(b)(3), Title V, § 543(b)(2), Nov. 29, 1990, 104 Stat. 4994, 5059; Pub.L. 102-232, Title III, § 306(c)(3), Dec. 12, 1991, 105 Stat. 1752; Pub.L. 104-208, Div. C, Title I, § 105(a), Sept. 30, 1996, 110 Stat. 3009-556.

number of prosecutions and the hostile climate that persists.

Though no publicly available statistics exist concerning the national origin of persons prosecuted for § 1325 today, the overwhelming number of Border Patrol arrests along the southern border are of Mexicans or people of Latinx origin. In 2000, over 97% of persons apprehended at the border were Mexican. In 2005, Mexicans made up 86% of apprehensions, and in 2010, 87%.[43] In the last decade, Mexicans have made up a smaller percentage of arrestees due to increased migration from Central America, but combined, the two groups easily constitute the overwhelming majority of border crossers.[44] *See The Committee Concerning Community Improvement v. City of Modesto*, 583 F.3d 690, 704 (9th Cir. 2009) (recognizing a disparate impact on Latinx people where the neighborhoods were "trending" Latinx during the relevant period).

Overall, these disparities are comparable to disparities that have supported other successful *Arlington Heights* challenges. *See, e.g.*, *Ave. 6E Investments*, 818 F.3d at 497 (concentrating most low-income housing in neighborhoods that are 75% Hispanic); *Arce*, 793 F.3d at 978 (targeting a program, 90% of whose enrollees were of Mexican or other Hispanic origin); *Community Improvement*, 583 F.3d at 704 (excluding 71% Latino areas from benefits, while extending those benefits to other areas that were only 48% Latino).

The disparate impact of border crossing crimes also manifests itself in other forms of hostility towards Mexican and Latinx immigrants. Echoes of the racialized

---

[43] *Border Patrol Total Apprehensions by Mexico and Other Than Mexico, 2000–2019*, https://www.cbp.gov/sites/default/files/assets/documents/2020-Jan/U.S.%20Border%20Patrol%20Total%20Monthly%20Family%20Unit%20Apprehensions%20by%20Sector%20%28FY%202013%20-%20FY%202019%29_0.pdf.

[44] *U.S. Border Patrol Nationwide Apprehensions by Citizenship and Sector, 2007 – 2019*, https://www.cbp.gov/sites/default/files/assets/documents/2020-Jan/U.S.%20Border%20Patrol%20Nationwide%20Apprehensions%20by%20Citizenship%20and%20Sector%20%28FY2007%20-%20FY%202019%29_1.pdf.

21

rhetoric surrounding the original enactment of § 1325 persist in the policies of the current administration, which has ramped up prosecutions under a "zero tolerance" policy.[45] The President has described Mexican and Latinx immigrants as "bad hombres,"[46] "animals,"[47] and "stone cold rapists and murderers."[48] Cataloguing several such statements, one court observed: "One could hardly find more direct evidence of discriminatory intent towards Latino immigrants." *CASA de Maryland*, 355 F. Supp. 3d at 325. Most pertinent here, some of the President's remarks echo the original rhetoric surrounding the law's passage:

> ***Associating Mexican immigrants with crime and disease***: Proponents of the original illegal entry law painted Mexicans as criminals who were bringing disease and poverty. In a February 1929 speech, for example, Rep. Box argued that Mexican immigrants "are badly infected with tuberculosis and other diseases; there are many paupers among them; there are many criminals; they work for lower wages; they are objectionable as immigrants when tried by the tests applied to other aliens." Exh. B, Cong. Rec. 3620.[49] Likewise, in a speech prior to the election, then-

---

[45] *See* "Attorney General Announces Zero-Tolerance Policy for Criminal Illegal Entry," U.S. Dept. of Justice, Apr. 6, 2018, *available at*: https://www.justice.gov/opa/pr/attorney-general-announces-zero-tolerance-policy-criminal-illegal-entry.

[46] *Debate: 3rd Presidential Debate Between Donald Trump and Hillary Clinton – October 19, 2016*, https://youtu.be/VvE6EjEf6G0?t=1146; see *also* Donald Trump (@realDonaldTrump), Twitter (May 17, 2019, 3:44AM), https://twitter.com/realDonaldTrump/status/1129336982319050752 ("Border Patrol is apprehending record numbers of people at the Southern Border. The bad 'hombres,' of which there are many, are being detained & will be sent home.").

[47] *Remarks: Donald Trump Hosts a Roundtable on Immigration and California – May 16, 2018*, https://youtu.be/KCGNMFXyd3Y.

[48] *Speech: Donald Trump Holds a Political Rally in Des Moines, Iowa – January 30, 2020*, https://youtu.be/c1sLLAEHvJ0?t=3059.

[49] *See also* Exh. J, Cong. Rec. 3547 (statement of Rep. Green) ("If you will examine the criminal records you will find that, in proportion to alien population, the percentage of criminals is largely foreign."); Exh. B, Cong. Rec. 3620 (statement of Rep. Fitzgerald) ("Another feature I suggest to the gentlemen is from a moral standpoint. [Mexican immigrants] are poisoning the American citizen."); Exh. J, Cong. Rec. 3545 (statement of Rep. Green) ("[I]t is estimated

candidate Trump claimed that "[w]hen Mexico sends its people, they're not sending their best. . . . They're bringing drugs. They're bringing crime. They're rapists. And some, I assume, are good people."[50] In a subsequent statement defending those remarks, he added that Mexican immigrants were bringing "infectious disease."[51] The President has since made numerous public remarks associating Mexican and Latinx immigrants with crime and disease.[52]

***Using charged language to describe southern border crossers***: Legislators seeking to enact the 1929 law used charged language to describe groups crossing the border. Rep. Blanton, for example, submitted that anyone who rode "up and down the Rio Grande River for miles" could see Mexican immigrants "coming in hordes." Exh. B, Cong. Rec. 3619. President Trump has likewise accused immigrants of "invading" and "infesting" the country.[53] In one public statement,

---

there are a million criminal aliens in the United States[.]").

[50] *Here's Donald Trump's Presidential Announcement Speech*, Time (June 16, 2020), https://time.com/3923128/donald-trump-announcement-speech/ (transcript of speech).

[51] Jesse Byrnes, *Trump: 'Infectious disease is pouring across the border,'* The Hill (July 6, 2015), https://thehill.com/blogs/ballot-box/246982-trump-infectious-disease-is-pouring-across-the-border.

[52] *See, e.g.*, *Speech: Donald Trump Holds a Political Rally in Colorado Springs, Colorado – February 20, 2020*, https://www.youtube.com/watch?time_continue=3850&v=97I1_86Ag-Y&feature=emb_logo (discussing deportations of "criminal aliens" back to "Guatemala, Honduras, El Salvador, Mexico"); Chris Mills Rodrigo, *Trump: Border wall needed to stop 'tremendous medical problem' coming into U.S.*, The Hill (December 11, 2018), https://thehill.com/homenews/administration/420870-trump-border-wall-needed-to-stop-tremendous-medical-problem-coming (linking lack of security at the southern border to "large scale crime and disease").

[53] *See, e.g.*, *Remarks by President Trump on the National Security and Humanitarian Crisis on Our Southern Border*, Feb. 15, 2019, https://www.whitehouse.gov/briefings-statements/remarks-president-trump-national-security-humanitarian-crisis-southern-border/; Natalie Martinez (@natijomartinez), Twitter (Aug. 4, 2019, 9:16AM), https://twitter.com/natijomartinez/status/1158049182877458433 (collecting political ads using the word "invasion" to describe immigration); Donald J. Trump (@realDonaldTrump), Twitter (Jun. 18, 2018, 6:52 AM), https://twitter.com/realDonaldTrump/status/1009071403918864385 ("Democrats . . . want illegal immigrants, no matter how bad they may be, to pour into and infest our country . . . .").

President Trump said, "You know they're bad. They're pouring in from El Salvador, Guatemala, Honduras, Mexico, all over. They're just pouring into our country!"[54]

**_Defending family separation_:** In a February 1929 debate, Rep. Green stated that he did "not entertain the sob stuff about separating families, and all the propaganda which is usually forced before the committees and before the House." Exhibit J, Cong. Rec. 3547, Feb. 15, 1929. Similarly, President Trump implemented a "zero tolerance" policy in 2018 that separated thousands of children from their parents and has continued to promote the virtues of family separation.[55] "When they used to separate children," he has stated, "far fewer people would come . . . [W]e stop[ped] the separation. The problem is you have 10 times more people coming up with their families. It's like Disneyland now. . . . It's a disaster."[56]

In line with the President's rhetoric, administration officials have enacted hardline policies disproportionately affecting Mexicans and Latin Americans—with mass prosecutions under § 1325 their most widely used tool. In April 2018, then-Attorney General Jeff Sessions announced a "zero tolerance" policy targeting illegal entry.[57] The following month, Sessions made clear at an address delivered in San Diego that "the Department of Homeland Security is now referring 100 percent of illegal Southwest Border crossings to the Department of Justice for

---

[54] _S.A._, 363 F. Supp. 3d at 1060.

[55] Miles Parks, Scott Detrow, & Kelsey Snell, _Trump Signs Order to End Family Separations_, NPR (Jun. 20, 2018), https://www.npr.org/2018/06/20/621798823/speaker-ryan-plans-immigration-votes-amid-doubts-that-bills-can-pass.

[56] _Interview: Maria Bartiomo Interviews Donald Trumpon Fox Sunday Morning Features – April 28, 2019_, https://youtu.be/hvUc7ONNTp4?t=89.

[57] _See_ "Attorney General Announces Zero-Tolerance Policy for Criminal Illegal Entry," U.S. Dept. of Justice, Apr. 6, 2018, _available at_: https://www.justice.gov/opa/pr/attorney-general-announces-zero-tolerance-policy-criminal-illegal-entry.

24

prosecution. And the Department of Justice will take up those cases."[58]

Both Sessions and Stephen Miller, a senior policy advisor to President Trump and the architect of the zero-tolerance policy,[59] have drawn inspiration from the discriminatory immigration laws of the 1920s. In a series of leaked emails, Miller lauded the immigration policies of this era, suggesting to a journalist, "This would seem a good opportunity to remind people about the heritage established by Calvin Coolidge, which covers four decades of the 20th century"—*i.e.*, the decades between the 1924 Act and its repeal in 1965.[60] Likewise, in a 2015 interview with Breitbart, Sessions expressed alarm at the rising percentage of "non-native born" Americans, noting that when immigration levels were "about this high in 1924," the President and Congress "changed the policy, and it slowed down immigration significantly."[61] He warned that repeal of those policies in 1965 had primed the country for a "surge fast past what the situation was in 1924."[62]

In short, both the volume and racial makeup of § 1325 prosecutions and the echoes of sentiments underlying the 1929 law show that it has disparately impacted Mexican and Latinx immigrants. Combined with the historical evidence of the law's discriminatory purpose, this satisfies the first step of *Arlington Heights*.

---

[58] "Attorney General Sessions Delivers Remarks Discussing the Immigration Enforcement Actions of the Trump Administration," Dept. of Justice, May 7, 2018, San Diego, California, https://www.justice.gov/opa/speech/attorney-general-sessions-delivers-remarks-discussing-immigration-enforcement-actions.

[59] *See, e.g.*, Julie Hirschfeld Davis & Michael D. Shear, *How Trump Came to Enforce a Practice of Separating Migrant Families*, N.Y. Times (June 16, 2018), https://www.nytimes.com/2018/06/16/us/politics/family-separation-trump.html?login=smartlock&auth=login-smartlock.

[60] Katie Rogers & Jason DeParle, *The White Nationalist Websites Cited by Stephen Miller*, N.Y. Times (Nov. 18, 2019), https://www.nytimes.com/2019/11/18/us/politics/stephen-miller-white-nationalism.html.

[61] Adam Serwer, *Jeff Sessions' Unqualified Praise for a 1924 Immigration Law*, Atlantic (Jan 10, 2017), https://www.theatlantic.com/politics/archive/2017/01/jeff-sessions-1924-immigration/512591/.

[62] *Id.*

25

**E.     The burden of proof shifts to the government.**

Because Mr. Zepeda has shown both a discriminatory purpose and a disparate impact underlying § 1325, the burden shifts to the government to show that the Undesirable Aliens Act of 1929 would have passed "even had the impermissible purpose not been considered." *Arlington Heights*, 429 U.S. at 266–68, 270 n.21. *See also Hunter*, 471 U.S. at 228 (shifting the burden to the law's defenders to "demonstrate that the law would have been enacted without this factor"). The Court should thus provide the government an opportunity to make this showing; if it declines to do so, the Court should dismiss the charge.

If, however, the government submits evidence showing that the 1929 law would have been enacted without a discriminatory purpose (or if the Court believes that Mr. Zepeda has not shown a disparate impact and discriminatory purpose), the Court should schedule an evidentiary hearing. Courts frequently hold evidentiary hearings and trials to hear evidence on the *Arlington Heights* factors. S*ee, e.g., City of Memphis v. Greene*, 451 U.S. 100, 107 (1981) (noting that the circuit court had previously remanded for a trial on the issue of discriminatory purpose); *see also Democratic National Committee v. Hobbs*, 948 F.3d 989, 998 (9th Cir. 2020) (en banc); *Arce*, 793 F.3d at 991. Indeed, the Supreme Court has found error where a lower court granted summary judgment "without an evidentiary hearing" on a legislature's disputed motives under *Arlington Heights*. *Hunt*, 526 U.S. at 545.

At this evidentiary hearing, Mr. Zepeda will present testimony from expert witnesses, including Dr. Kelly Lytle Hernández, Professor of History at the University of California, Los Angeles, and Dr. Benjamin Gonzalez O'Brien, Associate Professor of Political Science at San Diego State University. *See* Exhibit K, Curriculum Vitae of Prof. Lytle Hernández; Exhibit L, Curriculum Vitae of Prof. Gonzalez O'Brien. Both experts have written extensively on the Undesirable Aliens Act of 1929 and can testify about the historical events surrounding its passage. At the end of this hearing, if the government has not carried its burden to show that the

crime of illegal entry would have been enacted without a racially discriminatory motive, § 1325 is unconstitutional, and the Court must dismiss the charge.

### III.   MOTION TO PROHIBIT MR. ZEPEDA'S UNLAWFUL AND UNCONSTITUTIONAL CIVIL ARREST AT COURT

In March of 2011, ICE's director distributed Policy Number 10072.1 ("2011 Policy"), a document that detailed the agency's civil immigration enforcement priorities regarding non-citizens who were in the United States without authorization. The 2011 Policy said that immigration officers, facing limited resources, should focus on so-called "Priority 1 . . . aliens who pose a danger to national security or a risk to public safety . . . ." *Id.* In a follow-up memo, ICE explained that its policy prohibited it from initiating deportation proceedings against an "immediate victim or witness to a crime" and people "in the midst of a legitimate effort to protect their civil rights or civil liberties." *Ryan v. U.S. Immigration & Customs Enf't*, 382 F. Supp. 3d 142, 148 (D. Mass. 2019). In 2014 ICE released its policy on civil deportation arrests at courthouses, and instructed agents to only make such arrest against Priority 1 targets and only if it was not practical to make a civil deportation arrest elsewhere. *Id.*

Protocols changed when President Donald Trump issued Exec. Order No. 13,768, 82 Fed. Reg. 8,799, a policy that put greater emphasis on enforcement of immigration laws. The new order moved away from the Obama Administration policy that only prioritized people who pose a national security or public safety risk, and instead expanded the universe of potential arrestees to now include people who were convicted of any criminal offense, people who were merely charged with an offense, people who committed acts that constitute a chargeable criminal offense but were not actually charged, people who "engaged in fraud or willful misrepresentation" before a governmental agency, people abused social services, and people who are subject to a final order of removal. *Id.*

On January 10, 2018, ICE issued Directive Number 110721.1 ("2018

Courthouse Arrest Policy"), the agency's policy for civil immigration enforcement actions inside federal, state and local courthouses. This is the policy that is currently in place. The directive said that civil deportation arrests should occur inside courthouses because parties there are usually screened for weapons before they enter the building and can be presumed to be less dangerous. *Id*. at *1. It permitted civil deportation arrests inside courthouses of:

> [S]pecific, targeted aliens with criminal convictions, gang members, national security or public safety threats, aliens who have been ordered removed from the United States but have failed to deport, and aliens who have re-entered the country illegally after being removed, when ICE officers or agents have information that leads them to believe the targeted aliens are present at that specific location.

*Id*. The policy also allows agents to arrest for deportation "family members and friends accompanying the target alien to court appearances or serving as a witness in a proceeding" in some circumstances. *Id*.

With these policy memoranda as a backdrop, immigration officers in the Southern District of California have routinely arrested people charged with illegal entry in violation of 8 U.S.C. § 1325 in the courtroom or adjacent hallway immediately after the criminal case concludes. Immigration officers regularly follow defense lawyers to track § 1325 cases in various courtrooms, and they are present at trials sitting in the gallery waiting to effectuate a civil arrest once the trial is concluded. Mr. Zepeda expects similar treatment at his upcoming trial and he expects that immigration officers will attempt a civil removal arrest inside or directly outside the courtroom.

Because it is routine in SDCA for border patrol agents to be present for hearings and arrest defendants in the courtroom, it is highly likely that immigration officials plan to effectuate a warrantless removal arrest in this courthouse on the date of Mr. Zepeda's trial. This Court must take action to prevent immigration officers from effectuating a civil deportation arrest of Mr. Zepeda while Mr. Zepeda is at the courthouse or comes and goes from the courthouse for official business.

As explained below, this practice violates long-standing common law principles as well as Mr. Zepeda's Sixth Amendment and Due Process rights. If this Court fails to grant Mr. Zepeda's motion, he will be vulnerable to irreparable harm. As such, he requests that this Court stay the proceedings or final conclusion of the case until this motion is resolved on appeal.

This Court has broad supervisory powers "to remedy a constitutional or statutory violation; to protect judicial integrity by ensuring that a conviction rests on appropriate considerations validly before a jury; or to deter future illegal conduct." *United States v. Barrera–Moreno,* 951 F.2d 1089, 1091 (9th Cir. 1991). Mr. Zepeda has no adequate remedy other than this motion seeking an order that that civil deportation arrests of Mr. Zepeda or defense witnesses while either are headed to, at, or departing from the courthouse for official business violates common law and constitutional rights.

### A. Civil deportation arrests at courthouses violate a longstanding common law privilege protecting people from civil process coming to, attending, and departing from court for official court business

Deportation arrests at courthouses run afoul of a common law privilege that prohibits civil arrests at courthouses, or when parties, witnesses, and others attached to a case are at, en route to, or departing from a courthouse on official business. *See Stewart v. Ramsay*, 242 U.S. 128, 129 (1916). The Supreme Court in *Stewart* addressed whether a witness and plaintiff may be served with civil process while attending court for official business. "The true rule, well founded in reason and sustained by the greater weight of authority, is, that suitors, as well as witnesses, coming from another State or jurisdiction, are exempt from the service of civil process while in attendance upon court, and during a reasonable time in coming and going." *Id.* at 129. Four recent decisions from district courts have applied *Stewart* and the common law privilege against civil courthouse arrest to prohibit immigration officials from engaging in exactly the type of arrest Mr. Zepeda seeks to prevent in this motion. *See infra* Section III.A.3 (discussing cases).

29

1.   <u>Deportation arrests are civil arrests – they are not criminal.</u>

Immigration arrests can be civil or criminal, and the distinction is important to keep straight. Mr. Zepeda was criminally arrested and charged with an immigration violation at the start of this case. By contrast, the arrest by immigration authorities at issue in this motion is an arrest to place Mr. Zepeda in deportation proceedings, which is a civil, not criminal, proceeding. *I.N.S. v. Lopez-Mendoza*, 468 U.S. 1032, 1039 (1974) (holding that deportation proceedings are "purely" civil); *Arizona v. United States*, 567 U.S. 387, 407 (2012) (holding that "it is not a crime for a removable alien to remain present" in the United States and that deportation proceedings are civil even if criminal conduct is the reason for the deportation); *Fong Tue Ting v. United States*, 149 U.S. 698, 730 (1893) (holding that "deportation is not a punishment for a crime); *see also* HILLEL R. SMITH, CONG. RESEARCH SERV., LSB10362, IMMIGRATION ARRESTS IN THE INTERIOR OF THE UNITED STATES: A BRIEF PRIMER (2019) (explaining restrictions on deportation arrests).

The case law is clear that deportation proceedings are "purely" civil proceedings, and immigration authorities must adhere to the rules attendant to civil process when enforcing a civil deportation order.

2.   <u>There is a common law privilege that bars civil arrests at courthouses.</u>

A deportation arrest of Mr. Zepeda or a witness on their way to court, while at court, or for a reasonable time in departing from court on official business would violate the common law privilege that bars the civil arrest at the courthouse. This privilege is centuries old and is based on the simple premise that the justice system operates best when parties to a case show up for proceedings, and that parties won't go to court if they could be arrested once there. *See Stewart v. Ramsay*, 242 U.S. 128, 129-30 (1916); NATHAN LEVY., JR., MESNE PROCESS IN PERSONAL ACTIONS AT COMMON LAW AND THE POWER DOCTRINE, 78 YALE L.L. 52, 61-70 (1968)

30

(summarizing the history of civil arrests).[63]

The right to be free from civil process at court was clearly recognized by the Supreme Court over one hundred years ago in *Stewart*.

> The citizen, in every claim of right which he exhibits, and every defense which he is obliged to make, should be permitted to approach them, not only without subjecting himself to evil, but even free from the fear of molestation or hindrance. He should also be enabled to procure, without difficulty, the attendance of all such persons as are necessary to manifest his rights. Now, this great object in the administration of justice would in a variety of ways be obstructed, if parties and witnesses were liable to be served with process, while actually attending the court.

*Stewart*, 242 U.S. 129-30. The Court reaffirmed this privilege several years later in *Page Co. v. MacDonald*, 261 U.S. 446, 448 (1923), and this long standing privilege remains in effect to this day.

> 3. <u>Because deportation arrests are civil procedures, the common law doctrine barring civil arrests at courthouses necessarily bars deportation arrests at courthouses.</u>

*Stewart*'s common law rule prohibiting civil arrests does not include an exception for civil deportation arrests. When the Immigration and Naturalization Act ("INA") was enacted in 1952, the common law privilege against courthouse arrests was squarely in place as recognized by the Supreme Court in *Stewart* in 1916. Statutes that "invade" the common law must be read as to keep the common law intact unless the statute has a contrary purpose that is evident. *United States v. Texas*, 507 U.S. 529, 535 (1993). The INA does not address courthouse arrests and it cannot be said that Congress clearly intended to overturn the longstanding common law privilege against courthouse arrest when it passed the INA.

---

[63] This law review article is not available on Westlaw, but an open source version can be found at
https://digitalcommons.law.yale.edu/cgi/viewcontent.cgi?article=5938&context=ylj

The INA must be constrained by the longstanding rule against civil courthouse arrests because the common law privilege against civil courthouse arrests was clearly established long before the INA was passed and the INA did not contain a clear directive from Congress supplanting the common law privilege against civil arrest in court. Because this common law privilege is contained, rather than supplanted by the INA, civil deportation arrests that occur when a person is on their way to, at, or departing from official court business are impermissible because they run afoul of the long-standing common law privilege against civil arrest while attending, present at, or departing from official court business.

Every court that has been confronted with this issue has agreed that the common law privilege bars civil deportation arrests in or around the courthouse. Indeed, four recent decisions from three district courts have all unwaveringly ruled that there is a federal and state common law privilege that bars civil deportation arrests in courthouses and also prohibits authorities from arresting participants in a case as they head to or depart from a courthouse on official business. *See Ryan v. U.S. Immigration & Customs Enf't*, 382 F.Supp. 3d 142, 146, 160 (D. Mass. 2019) (ruling that plaintiffs were likely to succeed on the merits of a claim that civil immigration arrests are illegal and granting an injunction on such arrest, and holding that "[c]riminal defendants will be unable to vindicate their rights if they are taken into ICE custody prior to appearing in court or if witnesses in their defense are too fearful to visit a courthouse."); *New York v. U.S. Immigration & Customs Enf't*, 431 F. Supp.3d 377, 391 (S.D.N.Y 2019) (ruling that the common law privilege barring courthouse arrests is intact, prohibits deportation arrests and that ICE's courthouse arrest policy "deter[s] immigrants from appearing in court, thus denying them an opportunity to seek justice in their own cases and impeding civil suits and criminal prosecutions by dissuading them from serving as witnesses."); *Washington v. U.S. Dep't of Homeland Sec.*, No. C19-2043 TSZ, 2020 WL 1819837, at *26-27 (W.D. Wash. Apr. 10, 2020) (ruling that plaintiffs proved that

32

the common law privilege barring civil arrests, including deportation arrests, at courthouses "existed at the time the INA was enacted, that Congress did not abrogate the privilege or privileges when it passed the INA, and that, in issuing their 'courthouse arrest' policy, [DHS, ICE and CBP] exceeded the authority delegated to them in the INA."); and *New York v. U.S. Immigration & Customs Enf't*, No. 19-cv-8876(JSR), 2020 WL 3067715, at *7 (S.D.N.Y. June 10, 2020) (ruling that "courthouse civil arrests are not lawful, because they contravene the common-law privilege, which the INA is best read to incorporate, that protects courts and litigants against these intimidating and disruptive intrusions."). No courts have made rulings on this issue contrary to these four decisions.

While ICE has an internal policy to arrest people at courthouses, this policy runs afoul of Mr. Zepeda's rights to be free from such arrests. The reasons for the privilege – courts run better when all the relevant players show up – remain relevant today, and is critically important to provide litigants access to the court without being intimidated that their participation in the judicial system will compound their problems. This Court should grant this motion and rule consistent with the District of Massachusetts, the Western District of Washington, and the Southern District of New York to declare that a civil deportation arrest of Mr. Zepeda while Mr. Zepeda is en route to, at, or departing from the courthouse for official business would violate Mr. Zepeda's common law privilege against civil arrest.

**B.    The specter and likelihood of Mr. Zepeda being subject to a civil deportation arrest while attending court for his criminal matter infringes on his Sixth Amendment and Due Process rights to present a defense.**

The Sixth Amendment is the bedrock of the criminal justice system and guarantees a defendant the right to a speedy and public trial. The threat of civil immigration arrest while Mr. Zepeda is on his way to, present at, or departing from court on official court business chills the exercise of his right to present a defense and to call witnesses in his defense.

33

1. <u>ICE's courthouse arrest directive creates a chilling effect that harms a defendant's ability to receive due process.</u>

ICE's policy of arresting defendants at courthouses in order to begin civil deportation proceedings deters Mr. Zepeda from exercising his Sixth Amendment right to access the court to adjudicate his case.

Defendants have a Sixth Amendment fundamental right to access the court. Government policies, rules, and directives that deter defendants from attending court to adjudicate their case, and to defend their liberty interests interfere with this right and are illegal. *Bounds v. Smith*, 97 S. Ct. 1491, 1494 (1977); *United States v. Jackson*, 390 U.S. 570, 583 (1968); *Casey v. Lewis*, 43 F.3d 1261, 1266 (9th Cir. 1994); and *Natale v. United States*, 424 F.2d 725, 728 (9th Cir. 1970). *See also Nordstrom v. Ryan,* 762 F.3d 903, 906 (9th Cir. 2014) (holding that a jailhouse policy that deterred a defendant form communicating candidly with his attorney violated Sixth Amendment rights). ICE's civil courthouse arrests have such a chilling effect. *New York v. U.S. Immigration & Customs Enf't*, 431 F. Supp. 3d 377, 382 (S.D.N.Y. 2019).

Each time Mr. Zepeda appears at court for preliminary hearings, conference, trial, or other proceeding, an ICE officer may stalk him down corridors, watch him from the back of the courtroom, and arrest him for a civil deportation proceeding at their whimsy. The omnipresent risk of civil arrest entering, being present at, and leaving court infringes on Mr. Zepeda's right to be present at court to vindicate his right to present a defense. It forces him to exercise his right to present a defense by forfeiting his right to be free from civil arrest at court.

2. <u>Civil deportation arrests interfere with a defendant's ability to present evidence from defense witnesses.</u>

ICE's standing courthouse arrest directive independently intimidates defense witnesses by telling them that if they show up to court to testify in favor of the defendant, they may leave in handcuffs and in a fight to remain in the United States

34

as a result. The directive and the civil deportation arrests at courthouses spawned by it amount to an intimidation tactics that dissuades defense witnesses from appearing at court to testify and deprives Mr. Zepeda of the Sixth Amendment Compulsory Process Clause right to call witnesses in his defense. *Washington v. Texas*, 388 U.S. 14, 23 (1967). The case law is clear: the defendant is deprived of due process under the Sixth Amendment's Compulsory Process Clause when the state interferes with a defense witness's ability to testify. *Washington*, 388 U.S. at 23. "The Framers of the Constitution did not intend to commit the futile act of giving to a defendant the right to secure the attendance of a witness whose testimony he had no right to use." *Id*. Mr. Zepeda's ability to present a vigorous defense, complete with testimony from exculpatory witnesses, is in jeopardy because the risk of being arrested at a courthouse for deportation deters defendant-friendly witnesses from appearing at court to testify.

The Ninth Circuit has interpreted *Washington* broadly, holding that the government cannot interfere with the defense witness's "free and unhampered choice to testify." *Park v. Thompson*, 851 F.3d 910, 919 (9th Cir. 2017). *See also Earp v. Ornoski*, 431 F.3d 1158, 1170 (9th Cir. 2005). In order for defendants to fully realize their Sixth Amendment and Due Process rights to present a defense, the Court must ensure that the defendant and potential defense witnesses are not deterred from attending court. Confrontation rights are irreparably harmed if a defense witness is deterred from being present in court due to the threat of civil removal arrest. *See United States v. Valenzuela-Ruiz*, 458 U.S. 858, 867 (1982). The defendant is prejudiced when the government causes a loss of material and favorable evidence. *Id.* at 868. The defendant's rights are similarly harmed when the government transfers a witness who can provide testimony favorable to the defendant beyond the realm of service of the court, which would occur if a witness was deported. *United States v. Martinez-Morales*, 632 F.2d 112, 115 (9th Cir. 1980).

35

ICE's courthouse removal arrest directive is a warning shot that tells defense witnesses who may be subject to removal proceedings that if they show up at court to testify as a free man or woman, they might leave court in handcuffs. Consequently, the courthouse arrest policy chills witness participation and infringes on Mr. Zepeda's right to present a defense.

In sum, civil removal arrests in the courthouse infringe on the Mr. Zepeda's Sixth Amendment and Due Process rights to present a defense and call witnesses in his defense, because the threat of civil courthouse arrest chills witness participation and forces defendant's to choose between exercising their right to present a defense and exercising their right to be free from civil courthouse arrest.

### C.   Civil deportation arrests violate the Fourth Amendment.

The government has not produced a copy of a warrant for Mr. Zepeda's civil deportation arrest and it is believed that no such warrant exists. The only authority to for immigration officers to perform a warrantless deportation arrest is 8 U.S.C. § 1375(a)(2), which says:

> Any officer or employee of [ICE] authorized under regulations prescribed by the Attorney General shall have the power without warrant . . . to arrest any alien who in his presence or view is entering or attempting to enter the United States in violation of any law or regulation made in pursuance of law regulating the admission, exclusion, expulsion, or removal of aliens, or to arrest any alien in the United States, if he has reason to believe that the alien so arrested is in the United States in violation of any such law or regulation and is likely to escape before a warrant can be obtained for his arrest.

*Id.* This statute requires the government to satisfy two conditions before it can make a lawful deportation arrest. First, the arresting officer must have "reason to believe that the alien so arrested is in the United States in violation of any such law or regulation" and, second, there is "reason to believe" the target of the arrest "is likely to escape before a warrant can be obtained for his arrest." The Seventh Circuit noted

MR. ZEPEDA'S MOTIONS TO DISMISS THE COMPLAINT, PROHIBIT HIS UNLAWFUL ARREST AND STAY PROCEEDINGS

that the statutory requirement of probable cause that the alien is likely to escape "is always seriously applied." *United States v. Cantu*, 519 F.2d 494, 497 (7th Cir. 1975). In fact, the Supreme Court invalidated an Arizona statute that permitted warrantless arrests of removable aliens in part because the state statute did not require a finding of a likelihood of escape. *Arizona v. United States*, 567 U.S. 387, 408 (2012) (noting that federal officers may make a warrantless immigration arrest "only where the alien is likely to escape before a warrant can be obtained").

Courts have uniformly held that "the 'reason to believe' phrase in § 1357 'must be read in light of constitutional standards, so that 'reason to believe' must be considered the equivalent of probable cause.'" *Morales v. Chadbourne*, 793 F.3d 208, 216 (1st Cir. 2015); *Tejeda–Mata v. Immigration & Naturalization Serv.*, 626 F.2d 721, 725 (9th Cir.1980) ("The phrase 'has reason to believe' [in § 1357] has been equated with the constitutional requirement of probable cause.").

Assuming that ICE is able to establish the first § 1357(a)(2) requirement – reason to believe the person is present in violation of immigration law - ICE's warrantless courthouse arrest policy wholly fails to satisfy the second statutory factor that the person is likely to flee before a warrant could be obtained. The current arrest priorities and policies target individuals where there is no indication that the person is likely to escape, failing the second requirement of § 1375(a)(2) because there is no reason for an immigration officer to believe that the person he or she wishes to arrest will escape before a warrant may be obtained. All of the people that ICE arrests in the courthouse without a warrant are people who have demonstrated that they are affirmatively not a flight risk by coming to court and being present as required.

People who are defendants in a criminal charge have repeatedly shown up to court and provided officials with information about their location and associates in the United States. Their cases take at least weeks, if not months to adjudicate, and there is no indication that a person whose daily whereabouts are known is likely to

escape before a warrant can be obtained. The pendency of the criminal matter is surely plenty of time for a diligent ICE agent to obtain the proper warrant if he or she is able to meet the statutory requirement to obtain the warrant.

The government has not produced a civil arrest warrant for Mr. Zepeda and the Court should rule, consistent with § 1375 that its failure to obtain a civil warrant prevents ICE from arresting Mr. Zepeda in violation of his Fourth Amendment rights.

## IV.   MOTION TO STAY PROCEEDINGS

If the Court denies Mr. Zepeda's motions to prevent his civil removal arrest in court, the Court should stay Mr. Zepeda's trial pending an interlocutory appeal and/or writ of mandamus to the district Court. Mr. Zepeda intends to seek review before the district court if this Court denies his motion to prohibit civil deportation arrest in the courthouse and this Court should stay the criminal proceedings for resolution of this issue if it does not grant the motion to prohibit the civil arrest.

The issuance of a stay pending appeal is appropriate when the party requesting the stay demonstrates: (1) "serious questions going to the merits were raised," (2) "the balance of hardships tips sharply [in favor of the party seeking the stay]," (3) "there is a likelihood of irreparable injury" in the absence of a stay, and, (4) the stay is in the public interest. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134-35 (9th Cir. 2011); *see also Leiva-Perez v. Holder*, 640 F.3d 962, 964 (9th Cir. 2011) (applying the *Wild Rockies* "serious questions" test to the petitioner's request for a stay pending appeal). All of these factors weigh in favor of a stay because the Mr. Zepeda will suffer irreparable injury if forced to be present in court and subject to civil immigration arrest.

### A.   There are serious questions going to the merits of Mr. Zepeda's case.

To receive a stay, Mr. Zepeda is *not* required to show "that it is more likely than not that [he] will win on the merits." *Leiva-Perez*, 640 F.3d at 967. Instead,

Mr. Zepeda need only show that there are "serious questions going to the merits." *Id*. (quoting *Wild Rockies*, 632 F.3d at 1135). The Ninth Circuit has explained that this minimal standard makes sense in the context of a request for a stay because"[a] more stringent requirement would either . . . put every case in which a stay is requested on an expedited schedule, with the parties required to brief the merits of the case in depth for stay purposes, or would have the court attempting to predict with accuracy the resolution of often-thorny legal issues without adequate briefing and argument." *Leiva-Perez*, 640 F.3d at 967. "Such pre-adjudication adjudication would defeat the purpose of a stay, which is to give the reviewing court the time to 'act responsibly,' rather than doling out 'justice on the fly.'" *Id*. (quoting *Nken v. Holder*, 556 U.S. 418, 427 (2009)).

Here, Mr. Zepeda has demonstrated that there are serious questions going to whether he can lawfully be ordered to come to court while being subjected to civil immigration arrest on his way to court, while at court, or leaving from court. Moreover, the four recent district court decisions addressing this issue all agree with Mr. Zepeda's position. *See supra* Section III.A.3 (discussing cases).

**B.    The balance of hardships tips sharply in favor of Mr. Zepeda.**

The balance of hardships tips sharply in Mr. Zepeda's favor. Issuing a stay will not result in any hardship to the government. By contrast, Mr. Zepeda is currently out of custody on bond and in compliance with his bond conditions. Forcing the Mr. Zepeda to move forward with trial would likely subject him to unlawful civil immigration arrest at court regardless of the result of trial.

**C.    There is a likelihood of irreparable injury in the absence of a stay.**

If the proceedings in magistrate court continue while the legality of civil courthouse arrest remains in dispute, then Mr. Zepeda will be irreparably harmed in that he will forced to prepare with trial believing that his civil immigration arrest is likely to take place at the courthouse. As argued at length above, civil immigration arrests at the courthouse infringe on Mr. Zepeda's Sixth Amendment

39

and Due Process rights. Generally, the violation of a constitutional right suffices to demonstrate "irreparable harm." *See Brown v. Cal. Dep't of Transp.*, 321 F.3d 1217, 1225 (9th Cir. 2003).

    **D.**    **The stay is in the public interest.**

    There is a compelling and valid public interest that civil immigration arrests be thoroughly reviewed by the courts before Mr. Zepeda's case proceeds to trial because it may impact which members of the public wish to be present for court. Stripping the proceedings of the threat of civil arrest will encourage public access to the courts and it is therefore in the public's best interest for the legality of civil deportation arrests at the courthouse to be resolved before trial in this case.

**V.**    **CONCLUSION**

    Mr. Zepeda respectfully requests this Court grant his motions.

Respectfully submitted,

Dated:  July 24, 2020              *s/ Chandra L. Peterson*
                                      Federal Defenders of San Diego, Inc.
                                        Attorneys for Mr. Zepeda-Rodriguez
                                        Email:  Chandra_Peterson@fd.org